Donald S. Burris (SBN 68523)
Richard E. Walden (SBN 108646)
Laura Brys (SBN 242100)
BURRIS SCHOENBERG & WALDEN, LLP
12121 Wilshire Boulevard, Suite 800
Los Angeles, California 90025
Telephone: (310) 442-5559
Facsimile: (310) 442-0353

Samuel D. Levy (Pro Hac Vice Application to be Filed)
WUERSCH & GERING LLP
100 Wall Street, 21st Floor
New York, New York 10005
Telephone: (212) 509-5050

Attorneys for Plaintiff
CO-INVESTOR AG

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Co-Investor AG, | CASE NO. C 08-01812 SBA |
| Plaintiff, | Hon. Saundra B. Armstrong |
| | Dept. 3 |
| v. | |
| Fonjax, Inc. | **NOTICE OF ERRATA WITH** |
| Defendant. | **REGARD TO EXHIBITS "A"** |
| | **THROUGH "F"** |

NOTICE OF ERRATA

**PLEASE TAKE NOTICE** that Plaintiff Co-Investor AG ("Co-Investor"), in filing the Complaint on April 4, 2008 inadvertently failed to attach the exhibits in the correct order. In reviewing the file, Co-Investor took immediate steps to file the exhibits in the appropriate order. Attached hereto is a true and correct copy of said Exhibits in the correct order, which Co-Investor would ask this Court to incorporate by reference as Exhibits "A" through "F," respectively. A copy of this Notice of Errata is being concurrently served upon the counsel for Defendant Fonjax, Inc., which was previously served by substitute service.

Dated: May 8, 2008

BURRIS, SCHOENBERG & WALDEN, LLP

By: Laura G. Brys
Counsel for Plaintiff CO-INVESTOR AG

NOTICE OF ERRATA

**EXHIBIT A**

# FONJAX, INC.

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

This Series A Preferred Stock Purchase Agreement (this "*Agreement*") is entered into as of November 30, 2006 by and between FonJax, Inc., a Delaware corporation (the "*Company*") and the undersigned purchasers (each a "*Purchaser*" and collectively, the "*Purchasers*") set forth on the Schedule of Purchasers attached hereto as <u>Exhibit A</u> (the "*Schedule of Purchasers*"). The parties hereby agree as follows:

## SECTION 1

## AUTHORIZATION AND SALE OF SECURITIES

1.1 **Authorization.** The Company has, or before the Closing (as defined in Section 2.1) will have, duly authorized the sale and issuance pursuant to the terms and conditions hereof of shares of its Series A Preferred Stock (the "*Shares*") having the rights, restrictions, privileges and preferences set forth in the Second Amended and Restated Certificate of Incorporation (the "*Restated Certificate*") to be filed with the Delaware Secretary of State in substantially the form attached hereto as <u>Exhibit B</u>.

1.2 **Sale of Securities.** Subject to the terms and conditions hereof, at the Closing, the Company will issue and sell to each Purchaser, and each Purchaser agrees, severally and not jointly, to purchase from the Company, the number of Shares set forth opposite the Purchaser's name on the Schedule of Purchasers at a purchase price of $1.01 per share. Payment of the purchase price will be made by the Purchaser by (a) check, (b) wire transfer, or (c) cancellation of indebtedness of the Company to the Purchaser representing the aggregate purchase price of the Shares that the Purchaser is acquiring. For the avoidance of doubt, in the event that the purchase price of any Shares is paid through the conversion of outstanding promissory notes, the purchase price for the Shares so purchased shall be as described in such converted promissory notes.

## SECTION 2

## CLOSING; DELIVERY

2.1 **Closing.** The closing of the purchase by the Purchaser and the sale by the Company of the Shares (the "*Closing*") shall be held at the offices of DLA Piper US LLP, counsel to the Company, at 2000 University Avenue, East Palo Alto, California 94303, on the date hereof (the "*Closing Date*"), or at such other time and place as the Company and the Purchasers purchasing in the aggregate more than fifty percent (50%) of the Shares being sold hereto may agree either in writing or orally.

2.2 **Subsequent Sales of Series A Preferred Stock.** Subject to the terms and conditions set forth in this Agreement, the Company may sell up to the balance of the Shares not sold at the initial Closing to purchasers (each a "*Subsequent Purchaser*") at a per share price not

less than the price paid at the initial Closing. Any such sale shall be made upon the same terms and conditions as those set forth herein, and each Subsequent Purchaser shall become a party to this Agreement (and <u>Exhibit A</u> hereto shall be amended to include such Subsequent Purchaser), the Investor Rights Agreement attached hereto as <u>Exhibit C</u> (the "**Rights Agreement**"), the Right of First Refusal and Co-Sale Agreement attached hereto as <u>Exhibit E</u> (the "**Co-Sale Agreement**") and the Amended and Restated Voting Agreement attached hereto as <u>Exhibit F</u> (the "**Voting Agreement**") and shall have the rights and obligations, and be treated as, a Purchaser hereunder and an Investor thereunder. Each closing of a sale of Series A Preferred Stock to one or more Subsequent Purchasers shall be deemed to be a Closing for purposes of this Agreement. Each Purchaser hereby agrees to waive any rights of first refusal it may have in connection with the sale of Shares to Subsequent Purchasers.

2.3     **Second and Third Tranche Investments.** On or before February 28, 2007, Co-Investor AG or its assignees or transferees (collectively, the "**Multiple Tranche Purchaser**") shall purchase 297,029 Shares (the "**Second Tranche Shares**") in a second tranche of the initial Closing (the "**Second Tranche Closing**") and on or before April 30, 2007, the Multiple Tranche Purchaser shall purchase 766,118 Shares (the "**Third Tranche Shares**" and together with the Second Tranche Shares, the "**Subsequent Tranches Shares**") in a third tranche of the initial Closing (the "**Third Tranche Closing**" and together with the Second Tranche Closing, the "**Subsequent Tranches Closings**"), in each case, subject to the fulfillment by the Company of the Closing conditions set forth in Section 5.11. The Second Tranche Closing shall be held on or before February 28, 2007, and the Third Tranche Closing shall be held on or before April 30, 2007, in each case at the offices of DLA Piper US LLP, counsel to the Company, at 2000 University Avenue, East Palo Alto, California 94303, or at such other place as the Company and the Multiple Tranche Purchaser agree in writing or orally. The obligation of the Multiple Tranche Purchaser to purchase the Subsequent Tranches Shares pursuant to this Section 2.3 shall be transferable to affiliates of the Multiple Tranche Purchaser. Provided that the Company has fulfilled the Closing conditions set forth in Section 5.11 with respect to each of the Subsequent Tranches Closings, the failure of the Multiple Tranche Purchaser to purchase the Second Tranche Shares on or before February 28, 2007 and the Third Tranche Shares on or before April 30, 2007, shall result in the implementation of the special mandatory conversion set forth in Article IV, Section 7 of the Restated Certificate. In the event of a liquidation (as defined in Article IV, Section 2 of the Restated Certificate) prior to either the Second Tranche Closing or the Third Tranche Closing, as the case may be, the right of the Multiple Tranche Purchaser to Purchase the Second Tranche Shares and/or Third Tranche Shares shall be accelerated to a Closing date prior to the closing date of the liquidation. In the event of such accelerated Closing, the Multiple Tranche Purchaser may exercise its right to purchase the Second Tranche Shares and/or Third Tranche Shares on a net exercise basis (the "**Net-Purchase Right**"), if so requested. For the avoidance of doubt, in the event the Multiple Tranche Purchaser exercises its Net-Purchase Right, then it shall not be required to pay any cash consideration for such Second Tranche Shares and/or Third Tranche Shares. The number of Second Tranche Shares and/or Third Tranche Shares that would be issued to the Multiple Tranche Purchaser should it exercise the Net-Purchase Right shall be computed using the following formula:

$$X = (P)(Y)(A-B)/A$$

where  X = the number of Second Tranche Shares or Third Tranche Shares, as the case may be, to be issued to the Multiple Tranche Purchaser for the portion of the Second Tranche Shares or Third Tranche Shares, as the case may be, being net exercised.

      P = the portion of the Second Tranche Shares or Third Tranche Shares, as the case may be, being net exercised, expressed as a decimal fraction.

      Y = the total number of Shares issuable upon purchase of the full allotment of Second Tranche Shares or Third Tranche Shares, as the case may be.

      A = the fair market value of one Share as determined by the Company's Board of Directors (at the date of such calculation).

      B = the purchase price of $1.01 per share, as adjusted for any stock splits, stock dividends, recapitalizations or the like.

  2.4 **Delivery**.  At the Closing, the Company will issue to the Purchaser a certificate in the Purchaser's name representing the Shares purchased by the Purchaser, against payment of the purchase price therefor.  In the event that payment by a Purchaser is made, in whole or in part, by cancellation of indebtedness, then such Purchaser shall surrender to the Company for cancellation at the Closing any evidence of indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.  In addition, at the Closing the Company shall deliver to such Purchaser a check in the amount of any interest accrued on such indebtedness through the Closing.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

  Except as set forth in the Schedule of Exceptions attached hereto as <u>Exhibit D</u> (the "*Schedule of Exceptions*"), the Company hereby represents and warrants to each Purchaser as follows:

  3.1 **Organization and Standing**.  The Company is a corporation duly organized and existing under the laws of the State of Delaware and is in good standing under such laws.  The Company has the requisite corporate power to own and operate its properties and assets, and to carry on its business as presently conducted.  The Company is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the failure to so qualify would have a material adverse effect on the operations or financial condition of the Company.

  3.2 **Corporate Power**.  The Company has all requisite corporate power to enter into this Agreement, the Rights Agreement, the Co-Sale Agreement and the Voting Agreement, to sell the Shares hereunder and to carry out and perform its other obligations under the terms of this Agreement, the Rights Agreement, the Co-Sale Agreement and the Voting Agreement.

3.3     **Capitalization.**  Immediately prior to the Closing, the capitalization of the Company will consist of the following:

(a)     <u>Common Stock</u>.  A total of 20,000,000 authorized shares of Common Stock, of which 2,130,000 shares will be issued and outstanding.  All of the outstanding shares of Common Stock have been duly authorized, fully paid and are nonassessable and issued in compliance with all applicable federal and state securities laws.

(b)     <u>Preferred Stock</u>.  A total of 3,000,000 authorized shares of Preferred Stock, consisting of 3,000,0000 shares designated Series A Preferred Stock (the "*Series A Preferred*"), none of which will be issued and outstanding.

(c)     <u>Other Securities</u>.  The Company has warrants outstanding which, upon the Closing, will become exercisable for 75,000 shares of Series A Preferred Stock.  Except as set forth in this Section 3.3 or the Schedule of Exceptions hereto, the Company has no obligation (contingent or otherwise) to (i) issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any shares of its capital stock any evidences of indebtedness of the Company or (ii) purchase, redeem or otherwise acquire any shares of its capital stock or any interest therein or to pay any dividend or make any other distribution in respect thereof.

Following the Closing, the rights, preferences and privileges of the Series A Preferred will be as set forth in the Restated Certificate and as provided by law.

3.4     **Authorization.**  All corporate action on the part of the Company and its directors and shareholders necessary for the authorization, execution, delivery and performance of this Agreement, the Rights Agreement, the Co-Sale Agreement and the Voting Agreement (the "*Transaction Documents*") and the authorization, sale, issuance and delivery of the Shares and the performance of the Company's obligations hereunder has been taken or will be taken prior to the Closing.

(a)     This Agreement, when executed and delivered by the Company, will constitute a valid and binding obligation of the Company enforceable in accordance with its terms, subject to (i) laws of general application relating to specific performance, injunctive relief or other equitable remedies, (ii) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (iii) federal or state laws limiting enforceability of the indemnification provisions in the Rights Agreement.

(b)     When issued, sold and delivered in accordance with the terms of this Agreement for the consideration provided for herein, the Shares shall be duly authorized, validly issued, fully paid and non-assessable and shall be free of any liens or encumbrances, other than restrictions on transfer under the Transaction Documents and applicable state and federal securities laws.  The Company has duly and validly reserved sufficient shares of Common Stock to permit the conversion of the Shares, and such shares of Common Stock (the "*Conversion Shares*"), upon issuance in accordance with the terms of the Restated Certificate, will be duly authorized, validly issued, fully paid and non-assessable and will be free of any liens or

encumbrances, other than restrictions on transfer under the Transaction Documents and under applicable state and federal securities laws.

(c)    No stockholder of the Company has any right of first refusal or any preemptive rights in connection with the issuance and sale of the Shares or the issuance of the Conversion Shares which will not have been waived prior to the Closing.

3.5    **Subsidiaries**.  As of the date hereof, the Company does not presently own or control, directly or indirectly, any equity interest in any other corporation, partnership, trust, joint venture, association or other entity.

3.6    **Governmental Consents**.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority by the Company is required in connection with the consummation of the transactions contemplated by this Agreement *except*:  (i) such other qualifications or filings under the Securities Act of 1933, as amended, and the regulations thereunder (the "*Securities Act*"), (ii) the filing of a Notice of Transaction pursuant to Section 25102(f) of the California Corporate Securities Law of 1968, as amended, and the rules thereunder (the "*California Securities Law*"), and (iii) all other applicable securities laws as may be required in connection with the transactions contemplated by this Agreement.  All such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

3.7    **Compliance with Laws and Other Instruments; No Conflicts**.  The Company is not in violation or default of any provisions of its Restated Certificate or Bylaws, as amended to date or, to its knowledge, any applicable laws, regulations, judgments, decrees or orders of the United States of America and all states, foreign countries or other governmental bodies and agencies having jurisdiction over the Company's business or properties, other than violations of laws, regulations, judgments, decrees or orders that could not reasonably be expected to have a material adverse effect on the business, property, financial condition or results of operations of the Company (a "*Material Adverse Effect*").

3.8    **Registration Rights**.  Except as provided in the Rights Agreement, the Company has not granted or agreed to grant to any person or entity any rights (including piggyback registration rights) to have any securities of the Company registered with the United States Securities and Exchange Commission ("*SEC*") or any other governmental authority.

3.9    **Litigation**.  There is no litigation, action, suit or proceeding, or governmental inquiry or investigation, pending, or, to the best of the Company's knowledge, threatened in writing, against the Company which might result in Material Adverse Effect.  The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.  There is no action, suit, proceeding or investigation by the Company currently pending or which the Company intends to initiate.

3.10    **Financial Statements**.  The unaudited balance sheet and statements of operations and cash flows for the ten months ended October 31, 2006 (the "*Financial Statements*") fairly present the financial condition and operating results of the Company as of the dates, and for the

periods, indicated therein, subject to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no liabilities, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to the Financial Statements and (ii) obligations under contracts and commitments incurred in the ordinary course of business, which, individually or in the aggregate, are not material to the financial condition or operating results of the Company.

3.11    **Insolvency**. In respect of the Company, no application has been filed, order issued or resolution passed for the winding-up (including bankruptcy and liquidation) or for a composition with the creditors or any similar proceedings.

3.12    **Absence of Certain Changes**. Since October 31, 2006 and at all times up to the Closing, there has not been any event or condition of any character which has had a Material Adverse Effect on including, but not limited to:

(a)    any change in the assets, liabilities, financial condition or operating results of the Company from the Financial Statements, except changes in the ordinary course of business which have not been in the aggregate had a Material Adverse Effect;

(b)    any damage, destruction, or loss, whether or not covered by insurance, materially and adversely affecting the assets, financial condition, properties, operating results or business of the Company;

(c)    any change or amendment to a material contract or arrangement by which the Company or any of its assets or properties is bound or subject;

(d)    any satisfaction or discharge of any lien, claim or encumbrance or payment of any obligation by the Company, except a satisfaction, discharge or payment made in the ordinary course of business that is not material to the assets, properties, financial condition, operating results or business of the Company;

(e)    any sale, assignment or transfer of any patents, trademarks, copyrights, trade secrets or other intangible assets, except a sale, assignment or transfer made in the ordinary course of business that is not material to the assets, properties, financial condition, operating results or business of the Company;

3.13    **Taxes**. The Company has timely filed or has obtained presently effective extensions with respect to all federal, state, county, local and foreign tax returns which are required to be filed by it. All filed returns are true and correct in all material respects and all taxes shown thereon to be due have been timely paid with exceptions not material to the Company.

3.14    **Property and Assets**. The Company has good and marketable title to all of its material properties and assets, and good title to its leasehold estates, in each case subject to no mortgage, pledge, lien, security interest, lease, charge or encumbrance, other than liens resulting from taxes which have not yet become delinquent and liens and encumbrances which do not in any case materially detract from the value of the property subject thereto or materially impair the

operations of the Company, and which have not arisen otherwise than in the ordinary course of business.

3.15    **Intellectual Property**.

(a)    The Company has taken all steps to preserve the secrecy of all its Intellectual Property except where a failure to do so could not reasonably be expected to result in a Material Adverse Effect, and to otherwise preserve its rights with respect to Intellectual Property except where a failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)    The Company has not granted, and, to the Company's knowledge, there are no outstanding options, licenses or agreements of any kind relating to any Intellectual Property, nor is the Company bound by or a party to any option, license or agreement of any kind with respect to any Intellectual Property.  The Company is not obligated to pay any royalties to third parties with respect to the marketing, sale, distribution, manufacture, license or use of any Intellectual Property.

(c)    Each current officer, employee and consultant of the Company and each former employee that contributed to the intellectual property currently being used by the Company has executed in the Company's favor the standard agreement regarding confidentiality and proprietary information used by the Company.  To the Company's knowledge, none of its current or former employees, officers and consultants are in violation thereof.  No such person has excluded works or inventions made prior to his or her employment or other contractual relationship with the Company from his or her assignment of inventions pursuant to such agreement that could reasonably be expected to have a Material Adverse Effect.  Subject to any limitations on such vesting imposed by applicable law, full title and ownership of all inventions and proprietary rights, processes or methods developed or invented by any and all employees and consultants during the period of their employment and/or consultancy and resulting directly or indirectly from their work for the Company vest in the Company pursuant to each such agreement.

(d)    To the Company's knowledge, the carrying on of the Company's business by the employees and contractors of the Company and the conduct of the Company's business does not conflict with or breach the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such employees or contractors of the Company is now obligated (including with former employers).

(e)    For purposes of this Section 3.15, "*Intellectual Property*" means all of the Company's right, title, and interest in and to the following:

(i)    Copyrights, Trademarks and Patents;

(ii)    Any and all trade secrets, and any and all intellectual property rights in computer software and computer software products now or hereafter existing, created, acquired or held;

(iii)    Any and all design rights which may be available to the Company now or hereafter existing, created, acquired or held;

(iv)    Any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

(v)    All licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights;

(vi)    All amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and

(vii)    All proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

(f)    For purposes of this Section 3.15, "*Copyrights*" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof in which the Company has any interest, whether published or unpublished and whether or not the same also constitutes a trade secret, now or hereafter existing, created, acquired or held.

(g)    For purposes of this Section 3.15, "*Patents*" means all patents, patent applications and like protections in which the Company has any interest, including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

(h)    For purposes of this Section 3.15, "*Trademarks*" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections in which the Company has any interest, and the related goodwill of the business of the Company connected with and symbolized by such trademarks.

3.16    **Insurance.**  The Company maintains valid policies of workers' compensation insurance and insurance with respect to its properties and business of the kinds and in the amounts not less than are customarily obtained by corporations of established reputation engaged in the same or similar business and similarly situated, including, without limitation, insurance against loss, damage, fire, theft and public liability.

3.17    **Material Contracts and Obligations.**  The Schedule of Exceptions lists all contracts and agreements (a) with expected receipts or expenditures in excess of $15,000, (b) involving a license or grant of rights to or from the Company involving patents, trademarks, copyrights or other proprietary information applicable to the business of the Company, (c) providing for indemnification by the Company with respect to infringements of proprietary rights, (d) between the Company and any officer or director other than agreements entered into in

the ordinary course of business, or (e) involving any loans or advances by the Company to any officer, director or employee which are outstanding as of the date of the Closing. All such contracts and agreements are legally binding, valid, and in full force and effect in all material respects.

3.18    **Employees.** Each current, officer and consultant of the Company has executed and delivered a Proprietary Information and Inventions Agreement in the form previously provided to counsel for the Purchasers, and all of such agreements are in full force and effect. Except as set forth on the Schedule of Exceptions, to the Company's knowledge, no employee, officer or consultant of the Company is in violation of such Proprietary Information and Inventions Agreement. The Company is not a party to or bound by any currently effective written employment contract with any of its employees, other than those that are terminable at will.

3.19    **ERISA.** The Company does not have or otherwise contribute to or participate in any employee benefit plan subject to the Employee Retirement Income Security Act of 1974.

3.20    **Books and Records.** The minute books of the Company contain complete and accurate records of all meetings and other corporate actions of its shareholders and its Board of Directors and committees thereof. The stock ledger of the Company is complete and reflects all issuances, transfers, repurchases and cancellations of shares of capital stock of the Company.

3.21    **Securities Law Exemptions.** Based in part on the accuracy of the representations and warranties of the Purchasers contained in Section 4 hereof, the offer, sale and issuance of the Shares and the Conversion Shares are and will be exempt from the registration requirements of the Securities Act, and the registration, permit or qualification requirements of any applicable state securities laws. Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell any part of the Shares to any person or persons so as to bring the sale of such Shares by the Company within the registration provisions of the Securities Act or any state securities law.

3.22    **Disclosures.** Neither this Agreement nor any Exhibit hereto, when read together, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.

3.23    **Permits.** The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which would have a Material Adverse Effect on the Company, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as presently planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

## SECTION 4

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Each Purchaser hereby represents and warrants as follows:

4.1    **Authorization**. This Agreement constitutes the Purchaser's valid and legally binding obligation, enforceable in accordance with its terms except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies. The Purchaser has full power and authority to enter into this Agreement.

4.2    **Investment**. The Purchaser (other than the Multiple Tranche Purchaser) is acquiring the Shares and the Conversion Shares (collectively, the "Securities") for investment for the Purchaser's own account and not with the view to the public resale or distribution thereof within the meaning of the Securities Act, and such Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the Securities. No other person has a direct or indirect beneficial interest, in whole or in part, in such Securities. The Purchaser understands that the Securities have not been registered under the Securities Act by reason of a specific exemption thereunder, which depends upon, among other things, the bona fide nature of the Purchaser's investment intent as expressed herein.

4.3    **Relationship to Company; Sophistication; Experience**. The Purchaser either (i) has a preexisting business or personal relationship with the Company and/or any of its officers, directors or controlling persons or (ii) such Purchaser, either alone or with his or her purchaser representative(s), has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment in the Shares. Each purchaser representative, if any, in connection with the Purchaser's investment in the Securities, has confirmed in writing the specific details of any and all past, present or future relationships, actual or contemplated, between the Purchaser or the Purchaser's affiliates and the Company or any of the Purchaser's affiliates.

4.4    **Restrictions on Transfer**. The Purchaser (other than the Multiple Tranche Purchaser) acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or the Company receives an opinion of counsel satisfactory to the Company that such registration is not required. The Purchaser (other than the Multiple Tranche Purchaser) is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of stock purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the existence of a public market for the stock, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the stock to be sold, the sale being through a "broker's transaction" or a transaction directly with a "market maker" and the number of shares of the stock being sold during any three-month period not exceeding specified limitations. The Purchaser further acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Purchaser wishes to sell the Securities and, if so, the Purchaser would be precluded from selling the Securities under Rule 144 even if the one year minimum holding period has been satisfied.

4.5    **No Public Market**. The Purchaser understands that no public market now exists for the Securities, that there can be no assurance that a public market will ever exist for the Securities and that the Company is under no obligation to register the Securities.

**4.6** **Exemption from Registration.** The Purchaser further acknowledges that, in the event all of the requirements of Rule 144 are not met, compliance with another registration exemption will be required; and that, although Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and other than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, that such persons and the brokers who participate in the transactions do so at their own risk, and that, therefore, there is no assurance that any exemption from registration under the Securities Act will be available or, if available, will allow such person to dispose of, or otherwise transfer, all or any portion of the Securities.

**4.7** **Access to Information.** The Purchaser has had an opportunity to discuss the Company's business, management and financial affairs with the Company's management and the opportunity to inspect Company facilities and such books and records and material contracts as the Purchaser deemed necessary to its determination to purchase the Shares.

**4.8** **Purchaser's Liquidity.** The Purchaser (i) has no need for liquidity in the Purchaser's investment, (ii) is able to bear the substantial economic risks of an investment in the Securities for an indefinite period and (iii) at the present time, can afford a complete loss of such investment. The Purchaser's current commitments to illiquid investments is not disproportionate to the Purchaser's net worth, and the Purchaser's investment in the Securities will not cause such commitment to become disproportionate.

**4.9** **Offer and Sale.** The Purchaser understands that the sale of the Securities has not been registered under the Securities Act in reliance upon an exemption therefrom. The Purchaser was not offered or sold the Securities, directly or indirectly, by means of any form of general solicitation or general advertisement, including (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or (ii) any seminar or other meeting whose attendees had been invited by general solicitation or general advertising.

**4.10** **Risks.** The Purchaser is aware that the Securities are highly speculative and that there can be no assurance as to what return, if any, there may be. The Purchaser is aware that the Company may issue additional securities in the future which could result in the dilution of the Purchaser's ownership interest in the Company.

**4.11** **Reliance.** The Purchaser has relied only upon the information provided to him or her in writing by the Company, or information from books and records of the Company. No oral representations have been made or oral information furnished to Purchaser or his or her advisor(s) by the Company in connection with the offering of Shares which were not contained therein or were inconsistent therewith.

**4.12** **Investment Entity.** The Purchaser, if a corporation, partnership, trust or other entity, is authorized and otherwise duly qualified to purchase and hold the Securities; such entity has its principal place of business as set forth on the signature page hereof; and such entity has not been formed for the specific purpose of acquiring the Shares. The Purchaser, if an individual, is at least 21 years of age.

4.13    **Accredited Investor**. Such Purchaser either (A) is an "accredited investor" within the meaning of Securities and Exchange Commission ("SEC") Rule 501 of Regulation D, as presently in effect, or (B) (i) certifies that such Purchaser is not a "U.S. person" within the meaning of SEC Rule 902 of Regulation S, as presently in effect, and that such Purchaser is not acquiring the Securities for the account or benefit of any such U.S. person, (ii) agrees to resell the Securities only in accordance with the provisions of Regulation S, pursuant to registration under the Act, or pursuant to an available exemption from registration and agrees not to engage in hedging transactions with regard to such Securities unless in compliance with the Act, (iii) agrees that any certificates for any Securities issued to such Purchaser shall contain a legend to the effect that transfer is prohibited except in accordance with the provisions of Regulation S, pursuant to registration under the Act or pursuant to an available exemption from registration and that hedging transactions involving such Securities may not be conducted unless in compliance with the Act, (iv) agrees that the Company is hereby required to refuse to register any transfer of any Securities issued to such Purchaser not made in accordance with the provisions of Regulation S, pursuant to registration under the Act, or pursuant to an available exemption from registration.

4.14    **Foreign Purchasers**. If the Purchaser is not a United States person as defined in Rule 902(k) of Regulation S promulgated under the Securities Act such Purchaser hereby represents that such Purchaser is satisfied as to the full observance of the laws of such Purchaser's jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (i) the legal requirements within such Purchaser's jurisdiction for the purchase of the Securities, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, which may be relevant to the purchase, holding, redemption, sale, or transfer of the Securities. Such Purchaser's subscription and payment for, and continued ownership of, the Securities will not violate any applicable securities or other laws of such Purchaser's jurisdiction.

## SECTION 5

## CONDITIONS TO PURCHASERS' OBLIGATIONS AT CLOSING

The obligations of each Purchaser under Section 2 of this Agreement are subject to the fulfillment or waiver, on or before the Closing, of each of the following conditions: the waiver of which shall not be effective against any Purchaser unless waived by the Purchaser's of more than fifty percent (50%) of the Shares sold at any Closing, which consent may be given by written, oral or telephone communication to the Company or its counsel:

5.1    **Representations and Warranties True**. Each of the representations and warranties of the Company contained in Section 3 shall have been true and correct in all material respects when made and shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date. With respect to each the Subsequent Tranches Closings, (i) the representations and warranties of the Company contained in Section 3.11 shall have been true and correct in all material respects when made and shall be true and correct in all material respects on and as of the date of the Second Tranche Closing and the date of the Third Tranche

Closing, as the case may be, with the same effect as though such representations and warranties had been made on and as of the date of the Second Tranche Closing and the date of the Third Tranche Closing, as the case may be, and (ii) the remaining representations and warranties of the Company contained in Section 3 (other than Section 3.11) shall have been true and correct in all material respects when made, except as modified by updates to the Schedule of Exceptions to reflect the Company's business activities, and shall be true and correct in all material respects on and as of the date of the Second Tranche Closing and the date of the Third Tranche Closing, as the case may be, except as modified by updates to the Schedule of Exceptions to reflect the Company's business activities, with the same effect as though such representations and warranties (as modified by any updates to the Schedule of Exceptions) had been made on and as of the date of the Second Tranche Closing and the date of the Third Tranche Closing, as the case may be. With respect to subsection (ii) above, the Company shall be deemed to have not satisfied the conditions in this Section 5.1 in the event that any of the foregoing modifications to the Schedule of Exceptions include disclosures regarding events having a Material Adverse Effect.

5.2    **Performance of Obligations; Consents and Waivers.**  The Company shall have performed and complied in all material respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing Date and shall have obtained all approvals, consents and qualifications necessary to complete the purchase and sale described herein.

5.3    **Restated Certificate Effective.**  The Restated Certificate shall have been duly adopted by the Company by all necessary corporate action of its Board of Directors and shareholders, and shall have been duly filed with and accepted by the Secretary of State of the State of Delaware.

5.4    **Rights Agreement.**  The Purchasers and the Company shall have entered into the Rights Agreement in substantially the form attached hereto as <u>Exhibit C</u>.

5.5    **Right of First Refusal and Co-Sale Agreement.**  The Co-Sale Agreement in substantially the form attached hereto as <u>Exhibit E</u> shall have been executed and delivered by the parties thereto. The stock certificates representing the shares subject to the Co-Sale Agreement shall have been delivered to the Secretary of the Company and shall have had appropriate legends placed upon them to reflect the restrictions on transfer set forth in the Co-Sale Agreement.

5.6    **Voting Agreement.**  The Purchasers and the Company shall have entered into a an Amended and Restated Voting Agreement in substantially the form attached hereto as <u>Exhibit F</u>, and the Voting Agreement shall have been executed and delivered by persons holding a sufficient amount of shares of the Company to amend the Voting Agreement, dated as of July 5, 2005 (the "*Prior Voting Agreement*").

5.7    **Board of Directors.**  Effective as of the Closing, the Board of Directors shall consist of three (3) authorized directors. As of the Closing, the Board shall consist of Mark Moore, Dietrich Ulmer and Geoff Zawolkow.

5.8     **Securities Exemptions.**  The offer and sale of the Securities to the Purchaser pursuant to this Agreement shall be exempt from the registration requirements of the Securities Act, the qualification requirements of the California Securities Law and the registration and/or qualification requirements of all other applicable state securities laws.

5.9     **Opinion of Counsel.**  The Company shall have delivered an opinion of DLA Piper US LLP, counsel to the Company, addressed to the Purchasers and dated as of the date hereof, in the form attached hereto as <u>Exhibit G</u>.

5.10    **Compliance Certificate.**  The Company shall have delivered to the Purchasers a certificate dated as of the Closing, signed by the Company's President, certifying that the conditions set forth in Sections 5.1, 5.2, and 5.3 have been satisfied, and stating that there shall have been no adverse change in the business, affairs, operations, properties, assets or conditions of the Company since the date of the Financial Statements.

5.11    **Subsequent Closings; Subsequent Tranches Closings.**  Notwithstanding anything to the contrary in this Section 5, in the event of a subsequent sale of the Shares pursuant to Section 2.2 or either of the Subsequent Tranches Closings pursuant to Section 2.3, the Company shall only be required to satisfy the conditions set forth in Sections 5.1, 5.2 and 5.8.

## SECTION 6

## CONDITIONS TO COMPANY'S OBLIGATIONS AT CLOSING

The Company's obligation to sell and issue the Shares at each Closing is subject to the fulfillment of the following conditions, any of which may be waived by the Company:

6.1     **Representations and Warranties.**  The representations and warranties made by each Purchaser in Section 4 hereof shall have been true and correct when made and shall be true and correct on the Closing Date as if made on and as of such Closing Date.

6.2     **Consents and Waivers.**  The Company shall have obtained any and all consents and waivers necessary or appropriate for consummation of the transactions contemplated by this Agreement.

6.3     **Restated Certificate Effective.**  The Restated Certificate shall have been duly adopted by the Company by all necessary corporate action of its Board of Directors and shareholders, and shall have been duly filed with and accepted by the Secretary of State of the State of Delaware.

6.4     **Rights Agreement.**  The Purchasers and the Company shall have entered into the Rights Agreement.

6.5     **Right of First Refusal and Co-Sale Agreement.**  The Co-Sale Agreement shall have been executed by the parties thereto.

6.6     **Voting Agreement.**  The Purchasers and the Company shall have entered into the Voting Agreement, and the Voting Agreement shall have been executed and delivered by

persons holding a sufficient amount of shares of the Company to amend the Prior Voting Agreement.

6.7    **Securities Exemptions**.  The offer and sale of the Shares to the Purchaser pursuant to this Agreement shall be exempt from the registration requirements of the Securities Act, the qualifications requirements of the California Securities Law and the registration and/or qualification requirements of all other applicable state securities laws.

# SECTION 7

## RESTRICTIONS ON TRANSFERABILITY OF SECURITIES

7.1    **Restrictions on Transferability**.  The Securities shall not be transferable except upon the conditions specified in this Section 7.  The Purchaser will cause any proposed transferee of the Securities held by the Purchaser to agree to take and hold such Securities subject to the provisions and upon the conditions specified in this Section 7.  Each Purchaser agrees not to make any disposition of all or any portion of the Securities unless and until:

(a)    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    (A) The transferee has agreed in writing to be bound by the terms of this Agreement, (B) such Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a statement that sets forth the name, country of jurisdiction and corporate form of the transferee or assignee, and (C) if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Securities Act.  Notwithstanding the foregoing, (i) no Purchaser shall transfer any Securities to any transferee that the Board of Directors has reasonably determined is a competitor of the Company, and (ii) the Multiple Tranche Purchaser shall not transfer any of its Securities prior to the Subsequent Tranches Closings without the prior written consent of the Company, provided that the foregoing restriction in this subsection (ii) shall not apply with respect to: (x) transfers of Securities by the Multiple Tranche Purchaser to affiliates of the Multiple Tranche Purchaser as set forth in subsection (B)(ii) of the following paragraph, or (y) transfers of Securities by the Multiple Tranche Purchaser for a per share price equal to or greater than $1.01 per share, as adjusted for any stock splits, stock dividends, recapitalizations or the like.

Notwithstanding the provisions of subparagraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by a Purchaser which is (A) a partnership (i) to its partners or former partners in accordance with partnership interests, (ii) in accordance with the provisions of such partnership's definitive partnership agreement or (iii) to the spouse or siblings, lineal descendants or ancestors of such partners or former partners, (B) a corporation (i) to its shareholders in accordance with their interest in the corporation, or to an entity controlling, controlled by or under common control with such corporation, or (ii) to an affiliate of such Purchaser, i.e., a transferee (x) in which such Purchaser plays a leading role as

either a shareholder or investment manager or investment (sub-) adviser or (y) Purchaser designates a representative to serve on the board of directors or similar corporate body of the transferee, (C) a limited liability company (i) to its members or former members in accordance with their interest in the limited liability company, (ii) in accordance with the provisions of such limited liability company's definitive limited liability company operating agreement or (iii) to the spouse or siblings, lineal descendants or ancestors of such members or former members, or (D) to the Purchaser's family member or trust for the benefit of an individual Purchaser; *provided* that in each case the transferee will be subject to the terms of this Agreement to the same extent as if he were an original Purchaser hereunder, *provided further*, that if a transfer is made pursuant to Rule 144, then such transferee shall not be required to agree in writing to be bound by the terms of this Agreement.

7.2    **Restrictive Legends**.  Each certificate representing the Securities, and any other securities issued in respect of the Securities upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event (except as otherwise permitted by the provisions of this Section 7), shall be stamped or otherwise imprinted with legends in substantially the following form:

(a)    "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

(b)    Any other legends required by applicable state securities laws.

The Company need not register a transfer of legended Securities and may also instruct its transfer agent not to register the transfer of the Securities, unless the conditions specified in each of the foregoing legends are satisfied.

7.3    **Removal of Legend and Transfer Restrictions**.  Any legend endorsed on a certificate pursuant to subsection 7.2(a) and the stop transfer instructions with respect to such legended Securities shall be removed, and the Company shall issue a certificate without such legend to the holder of such Securities, if such Securities are registered under the Securities Act and a prospectus meeting the requirements of Section 10 of the Securities Act is available or if such holder satisfies the requirements of Rule 144(k).

# SECTION 8

## MISCELLANEOUS

8.1 **Entire Agreement; Amendment**. This Agreement and the exhibits to this Agreement constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof, and any and all other written or oral agreements relating to the subject matter hereof existing between the parties hereto are expressly superseded hereby. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the party against whom enforcement of any such amendment or waiver is sought; provided, however, that the beneficial owners of a majority of the Securities then outstanding may, with the Company's written consent, execute such amendment or waiver on behalf of all of the Purchasers other than any Purchaser that the amendment or waiver treats in a materially adverse manner relative to the other Purchasers. Any amendment or waiver effected in accordance with this Section 8.1 shall be binding upon the Company and the Purchaser and each future holder of the securities purchased hereunder.

8.2 **Governing Law**. This Agreement shall be governed in all respects by the internal laws of the State of California, without reference to principles of choice of law.

8.3 **Survival**. Unless otherwise set forth in this Agreement, the representations, warranties covenants and agreements made herein shall survive the execution and delivery of this Agreement and the Closing for a period of one (1) year following the Closing.

8.4 **Successors and Assigns**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

8.5 **Notices, Etc.** All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given (i) upon actual delivery to the party to be notified, (ii) 24 hours after confirmed facsimile transmission, or (iii) one business day after deposit with a recognized overnight courier, addressed (a) if to the Purchaser, at the Purchaser's address set forth on the Schedule of Purchasers, or at such other address as the Purchaser shall have furnished to the Company in writing upon 10 days' notice, (b) if to any other holder of any Securities, at such address as such holder shall have furnished the Company in writing upon 10 days' notice or, until any such holder so furnishes an address to the Company, to and at the address of the last holder of such Securities who has so furnished an address to the Company or (c) if to the Company, at the following address:

> FonJax, Inc.
> 1630 N. Main Street, #114
> Walnut Creek, CA  94596
> Attention:  President

Fax: (732) 909-8815

or at such other address as the Company shall have furnished to the Purchaser upon 10 days' notice.

8.6    **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTIONS 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

8.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

8.8    **Titles and Subtitles; References.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by this reference.

8.9    **No Finder's Fees.** Each party represents that it neither is nor will be obligated for any finder's or broker's fee or commission in connection with this transaction. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finders' or broker's fee (and any asserted liability) for which the Purchaser or any of its officers, partners, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee (and any asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

8.10    **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

8.11    **Expenses.** The Company and the Purchasers shall each bear their respective expenses and legal fees incurred in connection with the negotiation and consummation of this Agreement, except that the Company shall pay the reasonable fees and expenses of counsel for the Multiple Tranche Purchaser up to a maximum of $15,000, incurred with respect to the

negotiation, execution, delivery and performance of this Agreement and all schedules and annexes thereto; provided that such fees and expenses are presented to the Company in a reasonably detailed invoice.

8.12 **Delays or Omissions**. No delay or omission to exercise any right, power or remedy accruing to any Purchaser, upon any breach or default of the Company under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind of character on a Purchaser's part of any breach or default under this Agreement, or any waiver on a Purchaser's part of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing and that all remedies, either under this Agreement, or by law or otherwise afforded to a Purchaser, shall be cumulative and not alternative.

8.13 **Attorney Fees**. Notwithstanding any other provision herein, if any action at law or in equity is necessary to enforce or interpret the terms of this Agreement or the exhibits hereto, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

8.14 **Exculpation Among Purchasers**. Each Purchaser acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company. Each Purchaser agrees that no Purchaser nor the respective controlling persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

8.15 **Waiver of Conflicts**. Each party to this Agreement acknowledges that DLA Piper US LLP ("*DLA*"), outside general counsel to the Company, has in the past performed and is or may now or in the future represent one or more Purchasers or their affiliates in matters unrelated to the transactions contemplated by this Agreement (the "*Financing*"), including representation of such Purchasers or their affiliates in matters of a similar nature to the Financing. DLA Piper believes that its representation of the Company in the Financing will not adversely affect its relationship with those of the Purchasers who are clients of DLA, and that its representation of those Purchasers in matters unrelated to the Financing will not adversely affect DLA's representation of the Company in the Financing. The applicable rules of professional conduct require that DLA inform the parties hereunder of this dual representation and obtain their consent to DLA's representation of the Company, and their waiver of the conflict of interest which arises from their representation of the Company adverse to any of the Purchaser who are clients of DLA Piper. DLA has served as outside general counsel to the Company and has negotiated the terms of the Financing solely on behalf of the Company. The Company and each Purchaser hereby (a) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (b) acknowledge that with respect to the Financing, DLA has represented solely the Company, and not any Purchaser or any

stockholder, director or employee of the Company or any Purchaser; (c) gives its informed consent to DLA's representation of the Company in the Financing; and (d) represents that it has had the opportunity to be, or has been, represented by independent counsel in giving the waivers contained in this Section 8.15.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Series A Preferred Stock Purchase Agreement as of the date first set forth above.

**FonJax, Inc.**

By: _____
Mark Moore
President and Chief Executive Officer

COUNTERPART SIGNATURE PAGE TO
SERIES A PREFERRED STOCK PURCHASE AGREEMENT

PURCHASER:

CONNVESTOR AG

By: _____
Markus Beck
Member of the Board of Directors

By: _____
Dominik Wlodarczak
Chief Operating Officer

Address:    Zugerstrasse 74
            6340 Baar, Switzerland

Facsimile: _____

COUNTERPART SIGNATURE PAGE TO
SERIES A PREFERRED STOCK PURCHASE AGREEMENT

PURCHASERS:

SORIN PAPUC                          ERIC RINESTONE

_____            _____
(Signature)                          (Signature)

Address: _____           Address: _____
         _____                    _____


HENRY H. SOHN                        THEODORE MOORE

_____            _____
(Signature)                          (Signature)

Address: _____           Address: _____
         _____                    _____


BRAD JUNG

_____
(Signature)

Address: _____
         _____

COUNTERPART SIGNATURE PAGE TO
SERIES A PREFERRED STOCK PURCHASE AGREEMENT

PURCHASER:

Name: _____
(Please print or type)

Signature: _____

Address: _____
_____

Facsimile: _____

## EXHIBITS

Exhibit A – Schedule of Purchasers
Exhibit B – Second Amended and Restated Certificate of Incorporation
Exhibit C – Investor Rights Agreement
Exhibit D – Schedule of Exceptions
Exhibit E – Right of First Refusal and Co-Sale Agreement
Exhibit F – Amended and Restated Voting Agreement
Exhibit G – Opinion of Company Counsel

<u>Exhibit A</u>

SCHEDULE OF PURCHASERS

November 30, 2006

| Name | No. of Shares[1] | Aggregate Purchase Price |
|---|---|---|
| Co-Investor AG[2] | 1,485,147 | $1,499,998 |
| Co-Investor AG* | 511,448 | $266,563 |
| Sorin Papuc* | 51,134 | $26,646 |
| Eric Rinestone* | 304,125 | $157,167 |
| Henry H. Sohn* | 102,468 | $53,493 |
| Theodore Moore* | 100,749 | $51,757 |
| Brad Jung | 4,950 | $5,000 |
| **Total** | **2,560,021** | **$2,060,624.00** |

---

[1] Pursuant to Section 5.2 of each of the convertible promissory notes being tendered for cancellation as consideration for the Shares, the "Conversion Amount" as defined therein which constitutes the Aggregate Purchase Price hereof, is determined by multiplying 2 by the sum of the outstanding principal plus all accrued interest as of the conversion date.

[2] To be invested in three tranches of (i) $426,220 for 422,000 shares, (ii) $299,999.29 for 297,029 shares and (iii) $773,779.18 for 766,118 shares.

* Such shares are being issued pursuant to the conversion of outstanding convertible promissory notes held by the Purchaser.



Exhibit B

SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

PA\10476030.5
359255-6

Exhibit C

INVESTOR RIGHTS AGREEMENT

**Exhibit D**

SCHEDULE OF EXCEPTIONS

**Exhibit E**

RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

Exhibit F

AMENDED AND RESTATED VOTING AGREEMENT

## Exhibit G

### OPINION OF COMPANY COUNSEL

**EXHIBIT  B**

# SECOND AMENDED AND RESTATED
# CERTIFICATE OF INCORPORATION
# OF FONJAX, INC.

FonJax, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The name of the corporation is FonJax, Inc.

2.      The date of filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware was May 11, 2005.

3.      This Second Amended and Restated Certificate of Incorporation restates and integrates and further amends the Certificate of Incorporation of the corporation as herein set forth in full:

## ARTICLE I

The name of the corporation (hereinafter, the "*Corporation*") is FonJax, Inc.

## ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 3500 South Dupont Highway, City of Dover, County of Kent, and the name of the registered agent of the Corporation in the State of Delaware at such address is Incorporating Services, Ltd.

## ARTICLE III

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

## ARTICLE IV

The Corporation is authorized to issue two classes of stock, designated "*Common Stock*" and "*Preferred Stock*," each with a par value of $0.0001 per share. The total number of shares of Common Stock that the Corporation is authorized to issue is 20,000,000 shares. The total number of shares of Preferred Stock that the Corporation is authorized to issue is 3,000,000 shares.

The Preferred Stock may be issued from time to time in one or more series. The first series of Preferred Stock shall be comprised of 3,000,000 shares and shall be designated "*Series A Preferred Stock*." The relative rights, preferences, privileges and restrictions granted to or imposed upon the Series A Preferred Stock are as follows:

1.      **Dividends.**  The holders of the then outstanding Preferred Stock shall be entitled to receive, when and as declared by the Board of Directors, out of assets legally available

therefor, prior and in preference to any declaration or payment of any dividend on the Common Stock (payable other than in Common Stock or other securities or rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock), dividends at the annual rate of $0.0808 per share of Series A Preferred Stock, as adjusted for any stock splits, reverse stock splits, stock dividends, and similar recapitalization events (each a "**Recapitalization Event**").  No dividends shall be paid on any share of Common Stock unless a dividend (including the amount of any dividends paid pursuant to the above provisions of this Section 1) is paid with respect to all outstanding shares of Preferred Stock in an amount for each such share of Preferred Stock equal to or greater than the aggregate amount of such dividends for all shares of Common Stock into which each such share of Preferred Stock could then be converted.  The right to dividends on shares of Preferred Stock shall not be cumulative, and no right shall accrue to holders of Preferred Stock by reason of the fact that dividends on said shares are not declared in any period, nor shall any undeclared or unpaid dividend bear or accrue interest.

> **2.**     **Liquidation Preference.**  In the event of the liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the assets and funds of the Corporation available for distribution to stockholders shall be distributed as follows:

> **(a)**     First, the holders of shares of Series A Preferred Stock then outstanding shall be entitled to receive, out of the assets of the Corporation available for distribution to its stockholders, before any payment shall be made in respect of the Corporation's Common Stock, an amount equal to (i) $1.01 per share of Series A Preferred Stock, as adjusted for any Recapitalization Events (the "**Original Series A Price**"), plus (ii) simple interest at a rate of eight percent (8%) per annum from the Original Issue Dated (as defined below) calculated on the basis of actual number days elapsed based upon a 365 day year, plus (iii) all declared and unpaid dividends thereon to the date fixed for such distribution.  If, upon the occurrence of such event, the assets of the Corporation legally available for distribution to permit the payment to the holders of Series A Preferred Stock of the full preferential amount, then the entire assets available for distribution to stockholders shall be distributed to the holders of the Series A Preferred Stock ratably in proportion to the full preferential amounts which they would be entitled to receive pursuant to the preceding sentence of this Section 2(a).

> **(b)**     After the full preferential amounts due the holders of Preferred Stock pursuant to Section 2(a) have been paid or set aside, the remaining assets of the Corporation available for distribution to its stockholders, if any, shall be distributed to the holders of Common Stock and Preferred Stock ratably in proportion to the number of shares of Common Stock then held, or issuable upon conversion of the shares of Preferred Stock then held, by each holder, until, with respect to the Series A Preferred Stock, such holders have received an aggregate of three (3) times the Original Series A Price (including amounts received pursuant to Section 2(a)); thereafter, any remaining assets of the Corporation available for distribution to its stockholders shall be distributed to the holders of Common Stock ratably in proportion to the number of shares of Common Stock then held by each holder.

> **(c)**     (i) A merger or consolidation of the Corporation into or with another entity after which the stockholders of the Corporation immediately prior to such transaction do not own, immediately following the consummation of the transaction by virtue of their shares in

the Corporation or securities received in exchange for such shares in connection with the transaction, a majority of the voting power of the surviving entity in proportions substantially identical to those that existed immediately prior to such transaction and with substantially the same rights, preferences, privileges and restrictions as the shares they held immediately prior to the transaction, (ii) the sale, transfer or other disposition (but not including a transfer or disposition by pledge or mortgage to a bona fide lender) of all or substantially all of the assets of the Corporation (other than to a wholly-owned subsidiary), or (iii) the sale or transfer by the Corporation or its stockholders of more than 50% of the voting power of the Corporation in a transaction or series of related transactions other than in a transaction or series of transactions effected by the Corporation primarily for financing purposes shall be deemed to be a liquidation of the Corporation as that term is used in this Section 2.

      **(d)**    In the event of any liquidation of the Corporation involving the distribution of assets other than cash to the stockholders of the Corporation, the value of the assets to be distributed shall be determined as follows:

      **(i)**    In the case of securities that are not subject to investment letter or other similar restrictions on free tradability,

      **(A)**    if traded on a national securities exchange or through the Nasdaq National Market, the value shall be deemed to be the average of the closing prices of the securities over the 10 day period ending three days prior to the closing;

      **(B)**    if actively traded over-the-counter, the value shall be deemed to be the average of (i) the average of the last bid and ask prices or (ii) the closing sale prices (whichever is applicable) over the 30 day period ending three days prior to the closing; and

      **(C)**    if there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Corporation and the holders of at least a majority of the voting power of all then outstanding shares of Preferred Stock.

      **(ii)**    In the case of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate), the value shall be based on an appropriate discount from the market value determined as above in Section 2(d)(i) to reflect the approximate fair market value thereof, as mutually determined by the Corporation and the holders of at least a majority of the voting power of all then outstanding shares of Preferred Stock.

      **(iii)**In the case of any other property, the value shall be equal to the property's fair market value, as determined in good faith by the Board of Directors of the Corporation.

      **3.**    **Conversion.**  The holders of the Preferred Stock shall have conversion rights as follows:

      **(a)**    **Right to Convert.**  Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office

of the Corporation or any transfer agent for the Preferred Stock, into a number of fully paid and nonassessable shares of Common Stock equal to the Original Series A Price, in the case of the Series A Preferred Stock, divided by the Conversion Price for such series of Preferred Stock in effect at the time of conversion. The Conversion Price for the Series A Preferred Stock shall initially be $1.01 and shall be subject to adjustment as provided in Section 3(d) below.

(b)     **Automatic Conversion.** Each share of Preferred Stock shall automatically be converted into fully paid and nonassessable shares of Common Stock, at the then effective Conversion Price, upon (i) the vote or written consent of a majority of the voting power represented by the then outstanding shares of Preferred Stock or (ii) the closing of a firm commitment underwritten public offering pursuant to an effective registration statement on Form S-1 or Form SB-2 (or a successor form) under the Securities Act of 1933 covering the offer and sale of Common Stock at an offering price of not less than $5.05 per share, as adjusted for any Recapitalization Event, with aggregate gross proceeds to the Corporation (prior to underwriters' commissions and expenses) of not less than $20,000,000 (a "*Qualified Public Offering*").

(c)     **Mechanics of Conversion.** Before any holder of Preferred Stock shall be entitled to convert the same into shares of Common Stock, such holder shall surrender the certificate or certificates therefor, duly endorsed, at the headquarters of the Corporation or of any transfer agent for the Corporation and shall give written notice to the Corporation at such office that the holder elects to convert the same and shall state therein the name or names in which the certificate or certificates for shares of Common Stock are to be issued (except that no such written notice of election to convert shall be necessary in the event of an automatic conversion pursuant to Section 3(b) hereof). The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Stock, or to the nominee or nominees of such holder, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled as aforesaid. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted (except that, in the case of an automatic conversion upon an initial public offering pursuant to Section 3(b), such conversion shall be deemed to have been made immediately prior to the closing of the offering) and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date. Upon the occurrence of either of the events specified in Section 3(b) above, the outstanding shares of Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent; *provided, however,* that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless either the certificates evidencing such shares of Preferred Stock are delivered to the Corporation or its transfer agent as provided above, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation against any loss incurred by it in connection with such certificates.

(d)    **Adjustments to Conversion Price for Dilutive Issuances.**

(i)    **Special Definitions.**  For purposes of this Section 3(d), the following definitions shall apply:

(A)    "*Original Issue Date*" shall mean, with respect to any series of Preferred Stock, the date on which shares of such series are first issued by the Corporation.

(B)    "*Additional Shares of Common Stock*" shall mean all shares of Common Stock issued (or, pursuant to Section 3(d)(ii) below, deemed to be issued) by the Corporation after the Original Issue Date, other than:

(1)    shares of Common Stock issued upon conversion of Preferred Stock;

(2)    shares of Common Stock issued or issuable to officers, directors or employees of, or consultants to, the Corporation pursuant to any stock option plan or agreement or other stock incentive program or agreement approved by the Board of Directors;

(3)    shares of Common Stock issued or issuable to landlords, equipment lessors, lenders or other financial institutions in a commercial transaction or arrangement approved by the Board of Directors;

(4)    shares issued pursuant to a Qualified Public Offering;

(5)    shares issuable upon exercise of warrants and shares issued upon exercise or conversion of any warrants that are outstanding as of the date of this Second Amended and Restated Certificate of Incorporation;

(6)    issued in connection with the acquisition by the Corporation of voting control or all or substantially all of the assets of another business entity in a transaction approved by the Board of Directors;

(7)    shares for which an adjustment is made pursuant to Section 3(d)(v);

(8)    shares issued in connection with acquisitions of technology or intellectual property in transactions that are approved by the Board of Directors;

(9)    shares issued or issuable to any other persons or entities with which the Corporation has business relationships, provided that such issuances are not primarily for capital-raising purposes, and provided further that, at the time of any such issuance, the aggregate of such issuances and similar issuances during the preceding twelve (12) months does not exceed two percent (2%) of the then-outstanding Common Stock of the

Corporation (assuming full conversion and exercise of all outstanding convertible securities, options or warrants); or

(10)    shares issued or issuable pursuant to a transaction wherein the holders of a majority of the Preferred Stock, voting as a single class on an as-converted to Common Stock basis, agree in writing that such shares shall not cause a conversion price adjustment.

(C)    "*Options*" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire either Common Stock or Convertible Securities (as defined below).

(D)    "*Convertible Securities*" shall mean any evidences of indebtedness, shares of Preferred Stock or other securities convertible into or exchangeable for Common Stock.

(ii)    **Deemed Issue of Additional Shares of Common Stock.** In the event the Corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the following provisions shall apply:

(A)    The maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or upon the conversion or exchange of such Convertible Securities shall be deemed to be Additional Shares of Common Stock issued as of the time of the issuance of such Option or Convertible Security or, in case such a record date shall have been fixed, as of the close of business on such record date.

(B)    Except as provided in paragraphs (C) and (D) below, no further adjustment in the Conversion Price shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities.

(C)    If such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Corporation or the number of shares of Common Stock issuable upon the exercise, conversion or exchange thereof (other than a change resulting from the antidilution provisions of such Options or Convertible Securities), the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities; provided, however, that such recomputed Conversion Price shall not exceed the Conversion Price that would have been in effect had the original issuance of Options or Convertible Securities not been deemed to constitute an issuance of Additional Shares of Common Stock.

**(D)**    Upon the expiration of any such Options or Convertible Securities, the Conversion Price, to the extent in any way affected by or computed using such Options or Convertible Securities, shall be recomputed to reflect the issuance of only the number of shares of Common Stock actually issued upon the exercise of such Options or Convertible Securities.

**(iii)Adj    ustment of Conversion Price for Dilutive Issuances.**  In the event the Corporation shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section 3(d)(ii)) after the Original Issue Date of any series of Preferred Stock without consideration or for a consideration per share less than the Conversion Price for such series in effect immediately prior to such issuance, then and in each such event the Conversion Price for such series shall be reduced to a price (rounded to the nearest one tenth of one cent) equal to such Conversion Price multiplied by a fraction:

**(x)**    the numerator of which is equal to the number of shares of Common Stock outstanding or deemed to be outstanding immediately prior to such issuance plus the number of shares of Common Stock which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common Stock so issued would purchase at the Conversion Price in effect immediately prior to such issuance; and

**(y)**    the denominator of which is equal to the number of shares of Common Stock outstanding or deemed to be outstanding immediately prior to such issuance plus the number of Additional Shares of Common Stock so issued.

For the purposes of this paragraph (iii), the number of shares of Common Stock deemed to be outstanding shall be deemed to include the Common Stock issuable upon full exercise and conversion of all then outstanding Options and Convertible Securities.

**(iv)    Determination of Consideration.**  For purposes of this Section 3(d), the consideration received by the Corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

**(A)    Cash and Property.**  Such consideration shall:

**(1)**    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Corporation for any underwriting or otherwise in connection with the issuance and sale thereof;

**(2)**    insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board of Directors; and

**(3)**    in the event Additional Shares of Common Stock are issued together with other securities or other assets of the Corporation for consideration that covers both, be the proportion of such consideration so received, computed as provided in clauses (1) and (2) above, as determined in good faith by the Board of Directors.

**(B)    Options and Convertible Securities.** The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section 3(d) relating to Options and Convertible Securities shall be equal to:

**(x)**    the total amount, if any, received or receivable by the Corporation as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, divided by

**(y)**    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

**(v)**    **Other Adjustments to Conversion Price.**

**(A)    Subdivisions, Combinations or Consolidations of Common Stock.** In the event the outstanding shares of Common Stock shall be subdivided, combined or consolidated, by stock split, reverse stock split or similar event, into a greater or lesser number of shares of Common Stock after the Original Issue Date of a series of Preferred Stock, the Conversion Price for such series in effect immediately prior to such subdivision, combination or consolidation shall, concurrently with the effectiveness of such subdivision, combination or consolidation, be proportionately adjusted.

**(B)    Common Stock Dividends and Distributions.** If, after the Original Issue Date of a series of Preferred Stock, the Corporation at any time or from time to time issues, or fixes a record date for determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in additional shares of Common Stock, then in each such event, as of the time of such issuance or, in the event such record date is fixed, as of the close of business on such record date, the Conversion Price for such series that is then in effect shall be decreased by multiplying the Conversion Price then in effect by a fraction, (x) the numerator of which is the number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and (y) the denominator of which is the number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution; provided, however, that if such record date is fixed and such dividend or distribution is not paid in full on the date fixed therefor, the Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Conversion Price shall be adjusted pursuant to this Section 3(d)(v)(B) to reflect the actual payment of such dividend or distribution.

(C)    **Other Distributions.**  In case the Corporation shall distribute to holders of its Common Stock shares of its capital stock (other than shares of Common Stock and other than as otherwise subject to adjustment pursuant to this Section 3(d)), stock or other securities of other persons, evidences of indebtedness issued by the Corporation or other persons, assets (excluding cash dividends) or options or rights (excluding options to purchase and rights to subscribe for Common Stock or other securities of the Corporation convertible into or exchangeable for Common Stock), or shall fix a record date for determination of holders of Common Stock entitled to receive such a distribution, then, in each such case, provision shall be made so that the holders of Preferred Stock shall be entitled to receive, upon conversion thereof, in addition to the number of shares of Common Stock receivable thereupon, the amount of securities of the Corporation that they would have received had their Preferred Stock been converted into Common Stock on the date of such event (or on the record date with respect thereto, if such record date is fixed) and had they thereafter, during the period from the date of such event to and including the date of conversion, retained such securities receivable by them as aforesaid during such period, subject to all other adjustments called for during such period under this Section 3 with respect to the rights of the holders of the Preferred Stock.

(D)    **Recapitalizations and Reorganizations.**  In the case of any capital recapitalization or reorganization (other than a subdivision, combination or other recapitalization provided for elsewhere in this Section 3 or a merger or sale of assets provided for in Section 2), or the fixing of any record date for determination of holders of Common Stock affected by such recapitalization or reorganization, provision shall be made so that the holders of Preferred Stock shall be entitled to receive, upon conversion thereof, the type and number of shares of stock or other securities or property of the Corporation or otherwise that they would have received had their Preferred Stock been converted into Common Stock on the date of such event (or on the record date with respect thereto, if such record date is fixed) and had they thereafter, during the period from the date of such event to and including the date of conversion, retained such securities receivable by them as aforesaid during such period, subject to all other adjustments called for during such period under this Section 3 with respect to the rights of the holders of the Preferred Stock.  In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 3 to the end that the provisions of this Section 3 shall be applicable after the recapitalization or reorganization to the greatest extent practicable.

(E)    **Failure to Sell Additional Series A Preferred Stock.**  In the event that the Corporation sells and issues less than 1,534,653 shares of Series A Preferred Stock pursuant to the terms of the Series A Agreement (as defined in Section 7 below), then the Conversion Price for the Series A Preferred Stock shall be adjusted such that, as of the date of the final closing under the Series A Agreement, the holders of Series A Preferred Stock shall own, on an as-if converted to Common Stock basis, fifty percent (50%) of the then fully-diluted capitalization of the Company.

(e)    **Certificate as to Adjustments.**  Upon the occurrence of each adjustment or readjustment of the Conversion Price for a series of Preferred Stock pursuant to this Section 3, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of a share of such series of Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based including the consideration received for

any Additional Shares of Common Stock issued. The Corporation shall, upon the written request at any time of any holder of a Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect for the series of Preferred Stock held by such holder and (iii) the number of shares of Common Stock and the type and amount, if any, of other property which at the time would be received upon the conversion of a share of such series of Preferred Stock.

(f) **Fractional Shares.** No fractional shares of Common Stock shall be issued upon conversion of shares of Preferred Stock. In lieu of any fractional shares to which the holder of Preferred Stock would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the fair market value of one share of Common Stock as determined by the Board of Directors of the Corporation, rounded up to the nearest whole cent. The number of whole shares issuable to each holder of a series of Preferred Stock upon such conversion shall be determined on the basis of the number of shares of Common Stock issuable upon conversion of the total number of shares of such series being converted into Common Stock by such holder at that time.

(g) **Notices of Record Date.** In the event (i) the Corporation shall take a record of the holders of its capital stock for the purpose of entitling them to receive a dividend or other distribution (other than a cash dividend) or to subscribe for or purchase any shares of stock of any class or to receive any other rights, (ii) of any capital reorganization, reclassification or recapitalization (other than a subdivision or combination of its outstanding shares of Common Stock), or (iii) of the voluntary or involuntary dissolution, liquidation or winding up of the Corporation or any transaction deemed to be a liquidation pursuant to Section 2, then, and in any such case, the Corporation shall cause to be mailed to each holder of record of the Preferred Stock at the address of record of such stockholder as set forth on the Corporation's books, at least 20 days prior to the earliest date hereinafter specified, a notice stating the material terms of the proposed transaction and the date on which (x) a record is to be taken for the purpose of such dividend, distribution or rights or (y) such reorganization, reclassification, recapitalization, dissolution, liquidation or winding up is to take place and the date, if any is to be fixed, as of which holders of capital stock of record shall be entitled to exchange their shares of capital stock for securities or other property deliverable upon such reorganization, reclassification, recapitalization, dissolution, liquidation or winding up; provided, however, that such notice period may be shortened upon the written consent of holders of Preferred Stock that are entitled to such notice rights or similar notice rights and that represent at least a majority of the voting power of all then outstanding shares of such Preferred Stock. If any material change in the facts set forth in the written notice shall occur, the Corporation shall promptly give written notice of such material change to each holder of shares of Preferred Stock.

(h) **Reservation of Stock Issuable Upon Conversion.** The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of Preferred Stock, the Corporation will take such corporate action as may, in the opinion

of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

4.    **Redemption.**

(a)    **Redemption Date and Price.**  At any time after November 30, 2011, but within ninety (90) days after receipt by the Corporation of a written request from the holders of not less than a majority of the then outstanding shares of Preferred Stock that all or a specified percentage of such holders' shares of such series be redeemed, the Corporation shall, to the extent it may lawfully do so, redeem the shares specified in such request in three (3) annual installments in accordance with the procedures set forth in this Section 4 by paying in cash therefor an aggregate total per share equal to the Original Series A Price plus all declared or accumulated but unpaid dividends on such shares (the "*Redemption Price*" for such series).  The date fixed for redemption of each installment is referred to herein as a "*Redemption Date*."  The number of shares of each series of Preferred Stock that the Corporation shall be required to redeem on any Redemption Date shall be equal to (i) the aggregate number of shares of such series outstanding immediately prior to such Redemption Date, divided by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies).  Any redemption of less than all of the outstanding Series A Preferred Stock pursuant to this Section 4 shall be made pro rata among the holders of the Series A Preferred Stock in proportion to the number of shares of such series then held by each holder.

(b)    **Procedure.**  At least fifteen (15) but no more than thirty (30) days prior to each Redemption Date, written notice shall be mailed, first class postage prepaid, to each holder of record (at the close of business on the business day next preceding the day on which notice is given) of the Preferred Stock to be redeemed, at the address last shown on the records of the Corporation for such holder, notifying the holder of the redemption to be effected, specifying the number of shares to be redeemed from such holder, the Redemption Date, the applicable Redemption Price and the place at which payment may be obtained and calling upon such holder to surrender to the Corporation, in the manner and at the place designated, such holder's certificate or certificates representing the shares to be redeemed (the "*Redemption Notice*").  Except as provided in Section 4(c), on or after each Redemption Date, each holder of shares of Preferred Stock to be redeemed shall surrender to the Corporation the certificate or certificates representing such shares, in the manner and at the place designated in the Redemption Notice, and thereupon the applicable Redemption Price of such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof and each surrendered certificate shall be cancelled.  In the event less than all the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(c)    **Effect of Redemption; Insufficient Funds.**  From and after each Redemption Date, unless there shall have been a default in payment of the Redemption Price, all rights of the holders of shares of Preferred Stock designated for redemption in the Redemption Notice relating to such Redemption Date (except the right to receive the applicable Redemption Price without interest upon surrender of their certificate or certificates) shall cease with respect to such shares, and such shares shall not thereafter be transferred on the books of the Corporation or be deemed to be outstanding for any purpose whatsoever.  If the funds of the Corporation legally

available for redemption of Preferred Stock on any Redemption Date are insufficient to redeem the total number of shares of Preferred Stock to be redeemed on such date, those funds which are legally available shall be used to redeem the maximum possible number of such shares ratably among the holders of such shares to be redeemed based upon the total Redemption Price applicable to their shares of Preferred Stock which are subject to redemption on such Redemption Date. The shares of Preferred Stock not redeemed shall remain outstanding and entitled to all the rights and preferences provided herein. At any time thereafter when additional funds of the Corporation are legally available for the redemption of shares of Preferred Stock, such funds will immediately be used to redeem the balance of the shares which the Corporation has become obliged to redeem on any Redemption Date but which it has not redeemed.

5.     **Voting Rights.**

(a)     **General.** Each holder of Preferred Stock shall be entitled to a number of votes equal to the number of whole shares of Common Stock into which such holder's shares of Preferred Stock could then be converted and, except as otherwise required by law or as set forth herein, shall have voting rights and powers equal to the voting rights and powers of the Common Stock. Each holder of Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation and shall be entitled to vote with the holders of Common Stock with respect to any matter upon which holders of Common Stock have the right to vote, except as otherwise provided herein or those matters required by law to be submitted to a class vote.

(b)     **Election of Directors.** At each election of directors of the Corporation, (i) for so long as at least 500,000 shares of Series A Preferred Stock (as adjusted for any Recapitalization Events) remain outstanding, the holders of Series A Preferred Stock, voting as a separate class, shall be entitled to elect one (1) director, (ii) the holders of Common Stock, voting as a separate class, shall be entitled to elect one (1) director and (iii) the holders of Preferred Stock and Common Stock, voting together as a single class on an as-converted basis, shall be entitled to elect the remaining directors of the Corporation.

6.     **Protective Provisions.**

(a)     So long as at least 1,900,000 shares of Series A Preferred Stock are outstanding, the Corporation shall not, without first obtaining the affirmative vote or written consent of the holders of a majority of the voting power represented by the then outstanding shares of Series A Preferred Stock, enter into transaction or series of related transactions involving a merger or consolidation with another entity, or a sale, conveyance, pledging, exclusive license or distribution, or disposal of all or substantially all of its assets, unless the stockholders of the Corporation immediately prior to such transaction own, immediately following the consummation of the transaction by virtue of their shares in the Corporation or securities received in exchange for such shares in connection with the transaction, a majority of the voting power of the surviving or purchasing entity in proportions substantially similar to those that existed immediately prior to such transaction and with substantially the same rights, preferences, privileges and restrictions as the shares they held immediately prior to the transaction.

(b)     So long as at least 500,000 shares of Series A Preferred Stock are outstanding, the Corporation shall not, without first obtaining the affirmative vote or written consent of the holders of a majority of the voting power represented by the then outstanding shares of Series A Preferred Stock:

(i)     modify the rights, preferences, privileges or restrictions of the Preferred Stock so as to adversely affect the Series A Preferred Stock;

(ii)     authorize, create or issue any capital stock having rights or preferences senior to or being on parity with the Series A Preferred Stock as to dividend or liquidation rights or voting preferences;

(iii)incr     ease the total number of authorized shares of Series A Preferred Stock;

(iv)     declare or pay any dividend on the Common Stock, other than a dividend payable solely in shares of Common Stock; or

(v)     liquidate, dissolve or wind up the Corporation.

7.     **Special Mandatory Conversion.**

(a)     **Failure to Participate.**  In the event that the Multiple Tranche Purchaser (as defined in Section 2.3 of that certain Series A Preferred Stock Purchase Agreement, dated as of November 30, 2006, by and among the Corporation and the purchasers named therein (the "*Series A Agreement*")) fails either (i) to provide evidence to the Corporation of having wired the funds to a bank account designated by the Corporation for the purchase of its allotment of shares of Series A Preferred Stock as set forth therein on or before 5:00 p.m. California time on February 28, 2007 (the "*First Conversion Date*"), or (ii) to provide evidence to the Corporation of having wired the funds to a bank account designated by the Corporation for the purchase of its allotment of shares of Series A Preferred Stock as set forth therein on or before 5:00 p.m. California time on April 30, 2007 (the "*Second Conversion Date*"), and provided that the Corporation has fulfilled all material closing requirements with respect to such purchases, then in either event, all of the Multiple Tranche Purchaser's shares of Series A Preferred Stock shall automatically and without further action on the part of such holder, be converted, effective as of the First Conversion Date or Second Conversion Date, as the case may be, into a number of fully paid and nonassessable shares of Common Stock equal to the product of (i) the total number of shares of Series A Preferred Stock then held by the Multiple Tranche Purchaser multiplied by (ii) quotient of (x) the Original Series A Price, divided by (y) the product of (A) the Conversion Price for the Series A Preferred Stock then in effect, multiplied by (B) 100.

(b)     **Mechanics of Conversion.**  The holder of any shares of Series A Preferred Stock converted pursuant to this Section 7 shall deliver to the Corporation during regular business hours at the office of any transfer agent of the Corporation for the Series A Preferred Stock, or at such other place as may be designated by the Corporation, the certificate or certificates for the shares so converted, duly endorsed or assigned in blank or to the Corporation. As promptly as practicable thereafter, the Corporation shall issue and deliver to such holder, at the place designated by such holder, a certificate or certificates for the number of full shares of

the Common Stock to be issued and such holder shall be deemed to have become a stockholder of record of Common Stock on either the First Conversion Date or Second Conversion Date, as applicable, unless the transfer books of the Corporation are closed on that date, in which event such holder shall be deemed to have become a stockholder of record of Common Stock on the next succeeding date on which the transfer books are open. From and after the First Conversion Date and Second Conversion Date, as the case may be, the certificate or certificates representing shares of Series A Preferred Stock converted pursuant to this Section 7 shall represent the shares of Common Stock into which such shares of Series A Preferred Stock were converted.

(c)    **Deemed Conversion.** In the event that a holder of Series A Preferred Stock converts any Series A Preferred Stock into Common Stock pursuant to Section 3(a) hereof within ninety (90) days prior to either the First Conversion Date or Second Conversion Date, as applicable, such holder shall be deemed to have converted such shares pursuant to this Section 7.

8.    **Status of Converted or Redeemed Stock.** In the event any shares of Preferred Stock shall be converted or redeemed pursuant to Section 3, Section 4 or Section 7 hereof, or otherwise acquired by the Corporation, the shares so converted or redeemed shall be canceled and shall not be issuable by the Corporation, and the Certificate of Incorporation of the Corporation shall be appropriately amended to effect the corresponding reduction in the Corporation's authorized capital stock.

9.    **Residual Rights.** All rights accruing to the outstanding shares of the Corporation not expressly provided for to the contrary herein shall be vested in the Common Stock.

10.    **Consent to Certain Repurchases.** To the extent the Corporation may be subject to Section 2115 of the California Corporations Code, each holder of shares of Preferred Stock shall be deemed to have consented, for purposes of Sections 502 and 503 of the California Corporations Code, to any distribution made by the Corporation in connection with the repurchase of shares of Common Stock issued to or held by employees, officers, directors, consultants or other service providers (i) pursuant to agreements providing for such repurchase at the original purchase price, (ii) at a purchase price not exceeding the fair market value of such Common Stock, or (iii) in connection with the exercise of a contractual right of first refusal entitling the Corporation to purchase the shares upon the terms offered by a third party.

## ARTICLE V

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by this Second Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation. Election of directors need not be by written ballot, unless the Bylaws so provide.

## ARTICLE VI

The Board of Directors is authorized to make, adopt, amend, alter or repeal the Bylaws of the Corporation. The stockholders shall also have power to make, adopt, amend, alter or repeal the Bylaws of the Corporation.

## ARTICLE VII

To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended, a director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. The Corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits on indemnification set forth in Sections 204 and 317 of the California Corporations Code with respect to actions for breach of duty to the Corporation or its stockholders, to the extent the Corporation is subject to those provisions pursuant to Section 2115 of the California Corporations Code. Any repeal or modification of the foregoing provisions of this Article VII by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of, or increase the liability of any director of the corporation with respect to any acts or omissions occurring prior to, such repeal or modification.

## ARTICLE VIII

The Corporation reserves the right to amend or repeal any of the provisions contained in this Second Amended and Restated Certificate of Incorporation in any manner now or hereafter permitted by law, and the rights of the stockholders of the Corporation are granted subject to this reservation.

\*     \*     \*

4.     This Second Amended and Restated Certificate of Incorporation has been duly adopted by the board of directors and stockholders of the Corporation in accordance with the applicable provisions of Sections 242 and 245 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, this Second Amended and Restated Certificate of Incorporation has been executed by the Chief Executive Officer of the Corporation this 28th day of November, 2006.

FONJAX, INC.

By: /s/ Mark Moore
        Mark Moore, Chief Executive Officer

**EXHIBIT  C**

30. APR. 2007 14:54    +41-43-IFS 58-20-19    CO-INVESTOR AG    NR. 860    S. 3    03/12
30.4.07 14:22    Nassauer F    +41 43 268 20 19    +49 611 133 687    S.2
30/04/2007 14:18    +41-43-268-20-19    CO-INVESTOR AG    S. 04/11

## PROMISSORY NOTE

Baar, Switzerland
April 30, 2007

US$199,999.19

FOR VALUE RECEIVED, Co-Investor AG (the "Debtor"), hereby promises to pay to the order of FonJax, Inc., a Delaware corporation or its assigns (the "Lender"), the principal sum of US$199,999.19 together with interest from the date hereof at the rate of 9.00% per annum (on the basis of a year of 365 days), simple interest, on the unpaid balance of said principal sum.

Unpaid principal together with all accrued interest shall be due and payable at 5:00 p.m. California time on May 31, 2007 (the "Maturity Date"). Payments received shall be first applied to the payment of accrued interest and then to satisfaction of principal. In the event any interest is paid on this Promissory Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Promissory Note. Upon payment in full of all principal and interest payable hereunder, this Promissory Note shall be surrendered by the Lender to the Debtor for cancellation. The Debtor may prepay this Promissory Note in full or in part at any time without penalty or additional fees.

If action is instituted by the Lender to collect this Promissory Note, the Debtor shall pay all costs and expenses of collection, including reasonable attorney's fees. The Debtor and all endorsers, guarantors and assignors, if any, of this Promissory Note severally waive notice of default, presentation or demand for payment and protest and notice of nonpayment or dishonor. The validity, meaning and effect of this Promissory Note shall be determined in accordance with the laws of the State of California, without regarding to conflicts of law principals. Debtor acknowledges and understands that failure to pay all unpaid principal and accrued interest on the Maturity Date will result in the implementation of the special mandatory conversion of Debtor's shares of Series A Preferred Stock, as set forth in Article IV, Section 7 of the Lender's Second Amended and Restated Certificate of Incorporation, as may be amended from time to time.

IN WITNESS WHEREOF, the Debtor has caused this Promissory Note to be executed as of the date first hereinabove set forth.

CO-INVESTOR AG

By: _____
Markus Bach
Member of the Board of Directors

By: _____
Dr. Hans-Dieter Rompel
Member of the Board of Directors

Address:    Zugerstrasse 74
6340 Baar, Switzerland

Facsimile: _____

WA(10899922.1)
359258-2

30. APR. 2007 14:54    +41-41 IFS 68-26-19    CO-INVESTOR AG    NR. 860    S. 5    05/12
30/04/2007  14:10    +41-43-268-20-19    CO-INVESTOR AG    S.    06/11

# PROMISSORY NOTE

Baar, Switzerland
April 30, 2007

US$199,999.19

FOR VALUE RECEIVED, Co-Investor AG (the "Debtor"), hereby promises to pay to the order of Fonjax, Inc., a Delaware corporation or its assigns (the "Lender"), the principal sum of US$199,999.19 together with interest from the date hereof at the rate of 9.00% per annum (on the basis of a year of 365 days), simple interest, on the unpaid balance of said principal sum.

Unpaid principal together with all accrued interest shall be due and payable at 5:00 p.m. California time on June 30, 2007 (the "Maturity Date"). Payments received shall be first applied to the payment of accrued interest and then to satisfaction of principal. In the event any interest is paid on this Promissory Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Promissory Note. Upon payment in full of all principal and interest payable hereunder, this Promissory Note shall be surrendered by the Lender to the Debtor for cancellation. The Debtor may prepay this Promissory Note in full or in part at any time without penalty or additional fees.

If action is instituted by the Lender to collect this Promissory Note, the Debtor shall pay all costs and expenses of collection, including reasonable attorney's fees. The Debtor and all endorsers, guarantors and assignors, if any, of this Promissory Note severally waive notice of default, presentation or demand for payment and protest and notice of nonpayment or dishonor. The validity, meaning and effect of this Promissory Note shall be determined in accordance with the laws of the State of California, without regarding to conflicts of law principals. Debtor acknowledges and understands that failure to pay all unpaid principal and accrued interest on the Maturity Date will result in the implementation of the special mandatory conversion of Debtor's shares of Series A Preferred Stock, as set forth in Article IV, Section 7 of the Lender's Second Amended and Restated Certificate of Incorporation, as may be amended from time to time.

IN WITNESS WHEREOF, the Debtor has caused this Promissory Note to be executed as of the date first hereinabove set forth.

CO-INVESTOR AG

By: _____
Markat Beck
Member of the Board of Directors

By: _____
Dr. Hans-Dieter Rompel
Member of the Board of Directors

Address:    Zugerstrasse 74
            6340 Baar, Switzerland

Facsimile: _____

PAU0499929.1
N92237-0

30. APR. 2007 14:54    +41-4 IFS'68-20-19    CO-INVESTOR AG    NR. 860    S. 4    04/12
30 4 07 14:22    Nassauer H.    +41 43 268 20 19    +49 611 133 687    S.3
30/04/2007 14:10    +41-43-268-20-19    CO-INVESTOR AG    S. 05/11

# PROMISSORY NOTE

Baar, Switzerland
April 30, 2007

US$173,781.61

FOR VALUE RECEIVED, Co-Investor AG (the "Debtor"), hereby promises to pay to the order of FonJax, Inc., a Delaware corporation or its assigns (the "Lender"), the principal sum of US$173,781.61 together with interest from the date hereof at the rate of 9.00% per annum (on the basis of a year of 365 days), simple interest, on the unpaid balance of said principal sum.

Unpaid principal together with all accrued interest shall be due and payable at 5:00 p.m. California time on July 31, 2007 (the "Maturity Date"). Payments received shall be first applied to the payment of accrued interest and then to satisfaction of principal. In the event any interest is paid on this Promissory Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Promissory Note. Upon payment in full of all principal and interest payable hereunder, this Promissory Note shall be surrendered by the Lender to the Debtor for cancellation. The Debtor may prepay this Promissory Note in full or in part at any time without penalty or additional fees.

If action is instituted by the Lender to collect this Promissory Note, the Debtor shall pay all costs and expenses of collection, including reasonable attorney's fees. The Debtor and all endorsers, guarantors and assignors, if any, of this Promissory Note severally waive notice of default, presentation or demand for payment and protest and notice of nonpayment or dishonor. The validity, meaning and effect of this Promissory Note shall be determined in accordance with the laws of the State of California, without regarding to conflicts of law principals. Debtor acknowledges and understands that failure to pay all unpaid principal and accrued interest on the Maturity Date will result in the implementation of the special mandatory conversion of Debtor's shares of Series A Preferred Stock, as set forth in Article IV, Section 7 of the Lender's Second Amended and Restated Certificate of Incorporation, as may be amended from time to time.

IN WITNESS WHEREOF, the Debtor has caused this Promissory Note to be executed as of the date first hereinabove set forth.

CO-INVESTOR AG

By: _____
Markus Beck
Member of the Board of Directors

By: _____
Dr. Hans-Dieter Rompel
Member of the Board of Directors

Address:    Zugerstrasse 74
6340 Baar, Switzerland

Facsimile: _____

**EXHIBIT D**

**CERTIFICATE OF AMENDMENT TO THE**
**SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**FONJAX, INC.**

FonJax, Inc. (the "*Corporation*"), a corporation duly organized and existing under the General Corporation Law of the State of Delaware, does hereby certify that:

1.      Article IV, Section 7 of the Second Amended and Restated Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety to read as follows:

"7.      **Special Mandatory Conversion.**

(a)      **Failure to Participate.**  In the event that the Multiple Tranche Purchaser (as defined in Section 2.3 of that certain Series A Preferred Stock Purchase Agreement, dated as of November 30, 2006, by and among the Corporation and the purchasers named therein, as may be amended from time to time (the "*Series A Agreement*")) fails to provide evidence to the Corporation of having wired funds to a bank account designated by the Corporation for the payment of the principal and accrued interest due on each of the Third Tranche Notes (as defined in the Series A Agreement) on their respective maturity dates, then all of the Multiple Tranche Purchaser's shares of Series A Preferred Stock shall automatically and without further action on the part of such holder, be converted, effective as of the date one business day after the maturity date of any Third Tranche Note for which evidence of payment has not been so provided (the "*Conversion Date*"), into a number of fully paid and nonassessable shares of Common Stock equal to the product of (i) the total number of shares of Series A Preferred Stock then held by the Multiple Tranche Purchaser multiplied by (ii) quotient of (x) the Original Series A Price, divided by (y) the product of (A) the Conversion Price for the Series A Preferred Stock then in effect, multiplied by (B) 100.

(b)      **Mechanics of Conversion.**  The holder of any shares of Series A Preferred Stock converted pursuant to this Section 7 shall deliver to the Corporation during regular business hours at the office of any transfer agent of the Corporation for the Series A Preferred Stock, or at such other place as may be designated by the Corporation, the certificate or certificates for the shares so converted, duly endorsed or assigned in blank or to the Corporation. As promptly as practicable thereafter, the Corporation shall issue and deliver to such holder, at the place designated by such holder, a certificate or certificates for the number of full shares of the Common Stock to be issued and such holder shall be deemed to have become a stockholder of record of Common Stock on the Conversion Date unless the transfer books of the Corporation are closed on that date, in which event such holder shall be deemed to have become a stockholder of record of Common Stock on the next succeeding date on which the transfer books are open. From and after the Conversion Date the certificate or certificates representing shares of Series A Preferred Stock converted pursuant to this Section 7 shall represent the shares of Common Stock into which such shares of Series A Preferred Stock were converted.



(c)    **Deemed Conversion**.  In the event that a holder of Series A Preferred Stock converts any Series A Preferred Stock into Common Stock pursuant to Section 3(a) hereof within ninety (90) days prior to the Conversion Date such holder shall be deemed to have converted such shares pursuant to this Section 7."

2.    The foregoing Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation has been duly approved by the Board of Directors of the Corporation in accordance with the provisions of Section 141 of the General Corporation Law.

3.    The foregoing Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation has been duly approved by the written consent of the stockholders in accordance with Sections 228 and 242 of the General Corporation Law.

4.    The foregoing Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation shall be effective on and as of the date of filing with the Secretary of State of the State of Delaware.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**



IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation to be executed by its President and Chief Executive Officer on this 27 day of April, 2007.

**FONJAX, INC.**

By: _Mark Moore_

Mark Moore, Chief Executive Officer

EXHIBIT E

# FONJAX, INC.

# AMENDMENT TO SERIES A PREFERRED STOCK PURCHASE AGREEMENT

This Amendment (the "Amendment") to the Series A Preferred Stock Purchase Agreement dated as of November 30, 2006 (the "Agreement"), is entered into as of April ___, 2007, by and among FonJax, Inc., a Delaware corporation (the "Company") and the undersigned purchasers of Shares issued pursuant to the Agreement (collectively, the "Purchasers"). Capitalized terms used in this Amendment shall have the same meanings given to them in the Agreement unless otherwise indicated.

## RECITALS

The Company and the Purchasers desire to amend the Agreement to modify the terms and conditions upon which the Multiple Tranche Purchaser purchases the Third Tranche Shares. Pursuant to Section 8.1 of the Agreement, the Agreement may be amended, waived or modified upon the written consent of the Company and the beneficial owners of a majority of the Securities then outstanding. The undersigned Purchasers hold at least a majority of the Securities now outstanding.

## AGREEMENT

In consideration of the mutual promises contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, the parties to this Agreement agree as follows:

1.      Section 1.2 of the Agreement is hereby amended and restated in its entirety to read as follows:

"**1.2    Sale of Securities.**  Subject to the terms and conditions hereof, at the Closing, the Company will issue and sell to each Purchaser, and each Purchaser agrees, severally and not jointly, to purchase from the Company, the number of Shares set forth opposite the Purchaser's name on the Schedule of Purchasers at a purchase price of $1.01 per share. Payment of the purchase price will be made by the Purchaser by (a) check, (b) wire transfer, (c) promissory note or (d) cancellation of indebtedness of the Company to the Purchaser representing the aggregate purchase price of the Shares that the Purchaser is acquiring. For the avoidance of doubt, in the event that the purchase price of any Shares is paid through the conversion of outstanding promissory notes, the purchase price for the Shares so purchased shall be as described in such converted promissory notes."

2.      Section 2.3 of the Agreement is hereby amended and restated in its entirety to read as follows:

"**2.3    Second and Third Tranche Investments.**  On or before February 28, 2007, Co-Investor AG or its assignees or transferees (collectively, the "*Multiple Tranche Purchaser*") shall purchase 297,029 Shares (the "*Second Tranche Shares*") in a



second tranche of the initial Closing (the "***Second Tranche Closing***") and on or before April 30, 2007, the Multiple Tranche Purchaser shall purchase 766,118 Shares in a third tranche of the initial Closing (the "***Third Tranche Closing***" and together with the Second Tranche Closing, the "***Subsequent Tranches Closings***"), in each case, subject to the fulfillment by the Company of the Closing conditions set forth in Section 5.11. The Second Tranche Closing shall be held on or before February 28, 2007, and the Third Tranche Closing shall be held on or before April 30, 2007, in each case at the offices of DLA Piper US LLP, counsel to the Company, at 2000 University Avenue, East Palo Alto, California 94303, or at such other place as the Company and the Multiple Tranche Purchaser agree in writing or orally. The obligation of the Multiple Tranche Purchaser to purchase the Subsequent Tranches Shares pursuant to this Section 2.3 shall be transferable to affiliates of the Multiple Tranche Purchaser. The payment of the Third Tranche Shares at the Third Tranche Closing shall consist of a wire transfer by the Multiple Tranche Purchaser to the Company of $199,999.19 and the issuance of three promissory notes payable to the Company (the "***Third Tranche Notes***"), in the forms attached hereto as <u>Exhibit H-1, H-2 and H-3</u>. Provided that the Company has fulfilled the Closing conditions set forth in Section 5.11 with respect to each of the Subsequent Tranches Closings, the failure of the Multiple Tranche Purchaser to: (i) purchase the Second Tranche Shares on or before February 28, 2007, (ii) purchase the Third Tranche Shares on or before April 30, 2007, or (iii) pay the principal and accrued interest due on each of the Third Tranche Notes on their respective maturity dates (as defined in the Third Tranche Notes), shall result in the implementation of the special mandatory conversion set forth in Article IV, Section 7 of the Restated Certificate. In the event of a liquidation (as defined in Article IV, Section 2 of the Restated Certificate) prior to either the Second Tranche Closing or the Third Tranche Closing, as the case may be, the right of the Multiple Tranche Purchaser to Purchase the Second Tranche Shares and/or Third Tranche Shares shall be accelerated to a Closing date prior to the closing date of the liquidation. In the event of such accelerated Closing, the Multiple Tranche Purchaser may exercise its right to purchase the Second Tranche Shares and/or Third Tranche Shares on a net exercise basis (the "***Net-Purchase Right***"), if so requested. For the avoidance of doubt, in the event the Multiple Tranche Purchaser exercises its Net-Purchase Right, then it shall not be required to pay any cash consideration for such Second Tranche Shares and/or Third Tranche Shares. The number of Second Tranche Shares and/or Third Tranche Shares that would be issued to the Multiple Tranche Purchaser should it exercise the Net-Purchase Right shall be computed using the following formula:

$$X = (P)(Y)(A-B)/A$$

where

$X =$ the number of Second Tranche Shares or Third Tranche Shares, as the case may be, to be issued to the Multiple Tranche Purchaser for the portion of the Second Tranche Shares or Third Tranche Shares, as the case may be, being net exercised.

$P =$ the portion of the Second Tranche Shares or Third Tranche Shares, as the case may be, being net exercised, expressed as a decimal fraction.



Y =    the total number of Shares issuable upon purchase of the full allotment of Second Tranche Shares or Third Tranche Shares, as the case may be.

A =    the fair market value of one Share as determined by the Company's Board of Directors (at the date of such calculation).

B =    the purchase price of $1.01 per share, as adjusted for any stock splits, stock dividends, recapitalizations or the like."

3.    The Agreement is hereby amended to include as Exhibits H-1, H-2 and H-3, the documents attached hereto as <u>Exhibit A-1, A-2 and A-3</u>.

4.    Except as amended hereby, the Agreement remains in full force and effect.

5.    This Amendment is to be construed in accordance with and governed by the internal laws of the State of California without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. All disputes and controversies arising out of or in connection with this Amendment shall be resolved exclusively by the state and federal courts located in Contra Costa County in the State of California, and each party hereto agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

6.    This Amendment may be executed by facsimile signature and in any number of counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument. This Amendment shall become effective when one ore more counterparts have been signed by each party hereto and delivered to the other parties.

[THE REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]



IN WITNESS WHEREOF, the parties hereto have executed this Amendment to Series A Preferred Stock Purchase Agreement as of the date first written above.

**COMPANY:**

FonJax, Inc.

By: _____

Mark Moore, President

30. APR. 2007 14:54    +41-41-IFS:68-20-19    CO-INVESTOR AG    NR. 860    S. 9    89/12
30/84/2887  14:18    +41-43-268-20-15    CO-INVESTOR AG    S.  11/11

The parties have executed this Amendment to Series A Preferred Stock Purchase Agreement as of the date first written above.

PURCHASER:

CO-INVESTOR AG

By: _____
Markus Beck
Member of the Board of Directors

By: _____
Dr. Hans-Dieter Rompel
Member of the Board of Directors

Address:    Zugerstrasse 74
6340 Baar, Switzerland

Facsimile: _____

<u>Exhibit A-1</u>

Promissory Note due May 31, 2007



Exhibit A-2

Promissory Note due June 30, 2007



<u>Exhibit A-3</u>

Promissory Note due July 31, 2007

**EXHIBIT F**

Division of Corporations - Online Services

Page 1 of 2

 **State of Delaware** 
The Official Website for the First State

| State Directory | Help | Search Delaware : | | Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites |

Citizen Services | Business Services | Visitor Info.

Department of State: Division of Corporations

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions   View Search Results   Summary of Charges   Logout

## Entity Details

| | | | |
|---|---|---|---|
| File Number: | 3966962 | Incorporation Date / Formation Date: | 05/11/2005 (mm/dd/yyyy) |
| Entity Name: | FONJAX, INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |
| Status: | GOOD STANDING | Status Date: | 05/11/2005 |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | 2006 | | |
| Annual Tax Assessment: | $ 143,800.00 | Tax Due: | $ 0.00 |
| Tax Status: | CURRENT | Total Authorized Shares: | 23,000,000 |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | INCORPORATING SERVICES, LTD. | | |
| Address: | 3500 SOUTH DUPONT HIGHWAY | | |
| City: | DOVER | County: | KENT |
| State: | DE | Postal Code: | 19901 |
| Phone: | (302)531-0855 | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0240 | Amendment; Domestic | 3 | 04/30/2007 | 17:17 | 04/30/2007 |
| 2 | 0245S | Restated; Stock | 15 | 11/29/2006 | 10:15 | 11/29/2006 |
| 3 | 0245S | Restated; Stock | 5 | 06/23/2005 | 15:22 | 06/23/2005 |
| 4 | 0102S | Incorp Delaware Stock Co. | 3 | 05/11/2005 | 14:22 | 05/11/2005 |