UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CO-INVESTOR, AG,<br><br>    Plaintiff,<br><br>  vs.<br><br>FONJAX, INC.,<br><br>    Defendant. | Case No: C 08-1812 SBA<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>(Docket 26) |

    The instant diversity jurisdiction action arises from a stock purchase dispute between Plaintiff Co-Investor, AG ("Co-Investor") and Defendant FonJax, Inc. ("FonJax"). The parties are presently before the Court on Co-Investor's motion for preliminary injunction. (Docket 26.) Having read and considered the papers filed in connection with this matter, and being fully informed, the Court DENIES the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

**I.    BACKGROUND**

    **A.    THE STOCK PURCHASE AGREEMENT**

    FonJax is a start-up company that provides services for the testing of mobile technology software. (Compl. ¶ 6.) The Company was founded in 2005 by Mark Moore, who is the company's President, Chief Executive Officer and Chairman of the Board. (Moore Decl. ¶ 1.) Co-Investor is an experienced Swiss venture capital firm. (Id. ¶ 3; Compl. ¶ 4.) In the Fall of 2006, FonJax and Co-Investor began discussing the possibility of the latter investing in FonJax. (Moore Decl. ¶ 3.) The parties eventually reached a tentative deal which called for a $2 million investment

in FonJax, $1.5 million of which was to be paid in cash. (Moore Decl. ¶ 5.)[1] However, Co-Investor subsequently proposed structuring the investment as a multiple tranche purchase, meaning that the stock would be acquired incrementally in a series of rounds. (Id. ¶ 6.) FonJax resisted the proposal, but Co-Investor stated that the multiple tranche structure was non-negotiable. (Id. ¶ 7.) As a result, FonJax agreed to the proposal, but insisted that the payments be made by 5:00 p.m. on specified due dates, and that if any of the payments were late, Co-Investor's preferred stock would be converted to common stock. (Id.) Co-Investor accepted FonJax's proposal. (Id. ¶¶ 7-8.)

On November 30, 2006, Co-Investor and FonJax entered into a Stock Purchase Agreement ("SPA") for the purchase of 1,485,147 shares of FonJax Series A Preferred Stock ("Preferred Stock") for $1.5 million. (SPA Ex. A, att'd as Ex. A to Wlodarczak Decl.)[2] The parties agreed that Co-Investor would complete its investment in three tranches as follows: (a) $426,220 for 422,000 shares on or before November 30, 2006; (b) $299,999.29 for 297,029 shares on or before February 28, 2007; and (c) $773,779.18 for 766,118 shares on or before April 30, 2007. (SPA § 2.3 and Ex. A n.2.) Consistent with the parties' negotiations, Section 2.3 of the SPA provides that the failure of Co-Investor to purchase the Second <u>and</u> Third Tranche by their respective due dates "shall result in the implementation of the special mandatory conversion as set forth in Article IV, Section of the Restated Certificate." (Id.)

The Restated Certificate (formally entitled Second Amended and Restated Certificate of Incorporation and attached to the SPA), sets forth the rights, restrictions, privileges and preferences of holders of Preferred Stock. (SPA § 1.1.) The "special mandatory conversion" referenced in Section 2.3 of the SPA provides, is set forth in Article IV, Section 7 of the Restated Certificate. This provision reads, in relevant part, as follows:

> In the event that the Multiple Tranche Purchaser … fails either (i) to provide evidence to the Corporation of having wired the funds to a

---

[1] Preferred stock is entitled to priority over common stockholders in the event of a dissolution, liquidation or winding up of the company. (Second Amended and Restated Certificate, Art. IV, § 2.) In addition, preferred shareholders have voting rights commensurate with their ownership interest. (Id. § 5(a).)

[2] The SPA and related agreements and amendments are attached to the declaration of Dominik Wlodarczak.

> bank account designated by the Corporation for the purchase of its allotment of shares of Series A Preferred Stock as set forth therein on or before 5:00 p.m. California time on February 28, 2007 (the "*First Conversion Date*"), or (ii) to provide evidence to the Corporation of having wired the funds to a bank account designated by the Corporation for the purchase of its allotment of shares of Series A Preferred Stock as set forth therein on or before 5:00 p.m. California time on April 30, 2007 (*the "Second Conversion Date"*)… then … <u>all of the Multiple Tranche Purchaser's shares of Series A Preferred Stock shall automatically and without further action on the part of such holder, be converted, effective as of the First Conversion Date or Second Conversion Date … into a number of fully paid and nonassessable shares of Common Stock</u>….

(Restated Cert., Art. IV, § 7(a) (emphasis added).) In the event of such a conversion, the preferred stockholder is to present its shares for cancellation and replacement with common stock certificates. (<u>Id.</u> § 7(b).) In addition, FonJax is obligated to amend its Certificate of Incorporation "to effect the corresponding reduction in the Corporation's authorized stock." (<u>Id.</u>, § 8 at 14.)

### B. THE AMENDMENT TO THE SPA

In late April 2007, Co-Investor informed FonJax of its desire to extend the deadline for funding the Third Tranche, which at that time was due by April 30, 2007. (Wlodarczak Decl. ¶ 7; Moore Decl. ¶ 10.) The parties reached an agreement, which is set forth in an Amendment to Series A Preferred Stock Purchase Agreement ("Amendment to the SPA"). (Wlodarczak Decl. Ex. B.) The parties agreed to revise Section 2.3 of the SPA such that the closing date for the Third Tranche would remain on April 30, 2007, but that Co-Investor was to pay for the Preferred Stock in installments. Specifically, Co-Investor was to make an immediate payment of $199,999.19 by wire transfer, with the remaining balance to be paid in three installments. Co-Investor's payment obligations were memorialized in three separate promissory notes, referred to as the Third Tranche Notes. (Am. to the SPA § 2.3.) Notably, the terms regarding the special automatic conversion provision also were modified to provide that Co-Investor's failure to timely pay for either the Second Tranche <u>or</u> any of the three installments due for the Third Tranche would trigger the conversion. (<u>Id.</u>) In the original version of the SPA, the conversion provision could be implemented only if Co-Investor failed to pay on both the Second <u>and</u> Third Tranche.

The first of the three Third Tranche Notes in the amount of $199,199.19, plus interest, became due on May 31, 2007; the second note in the amount of $199,199.19 plus interest was due

on June 30, 2007; and the third note in the amount of $173,781.61 plus interest was due on July 31, 2007. (Id.) Except for the amount of the principal and the due date, all of the notes are identically worded. Each states that that payment of "[u]npaid principal together with all accrued interest shall be due and payable at 5:00 p.m. California time on [specified date] (the "Maturity Date")." In addition, each note includes the acknowledgement that "Debtor [Co-Investor] understands that the failure to pay all unpaid principal and accrued interest on the Maturity Date will result in the implementation of the special mandatory conversion of Debtor's shares of Series A Preferred Stock, as set forth in Article IV, Section 7 of the Lender's [FonJax] Second Amended and Restated Certificate of Incorporation…." (Id.)

Along with the Amendment to the SPA, the parties amended the Restated Certificate on April 27, 2007, by executing a Certificate of Amendment to Second Amended and Restated Certificate of Incorporation of FonJax, Inc. ("Certificate of Amendment"). (Wlodarczak Decl. Ex. C.) The Certificate of Amendment amended and restated Section 7(a) of the SPA to provide that if Co-Investor "fails to provide evidence to the Corporation [FonJax] of having wired funds … for the payment of the principal and accrued interest due on each of the Third Tranche Notes … on their respective maturity dates, then all of Multiple Tranche Purchasers' [Co-Investor] shares of Series A Preferred Stock shall automatically and without further action on the part of such holder, be converted, effective as of the date one business day after the maturity of any Third Tranche Note for which evidence of payment has not been so provided." (Cert. of Am. § 7(a) at 1.)

### C. FONJAX'S PAYMENT HISTORY

As noted, the first payment on the Third Tranche Notes became due and payable on May 31, 2007 by 5:00 p.m. California time. Co-Investor claims it "timely initiated wire payment" in the amount of $200,000 on May 31st, (Wlodarczak Decl. ¶ 15), though the payment was not posted to FonJax's bank account until June 4, 2007, (Moore Decl. ¶ 15). The next day on June 1, 2007, Co-Investor sent FonJax an email notifying the latter that payment in the amount of $200,000 had been wired. (Wlodarczak Decl. ¶ 15.) Upon being advised of such payment, FonJax informed Co-Investor that it still owed $1,726.00 in interest. (Id. ¶ 16.) Co-Investor tendered payment of the additional interest on July 3, 2007, over a month after it was due. (Id.)

The next installment on the Third Tranche was due by June 30, 2007. The amount due, including interest, was $203,007.40. (Moore Decl. ¶ 15.) On July 2, 2007, FonJax received a late payment from Co-Investor in the amount of $200,000. (Id.) Three days later on July 5, 2007, Co-Investor paid FonJax the sum of $3,008.21, representing the interest owed on the second installment. (Id.; Wloddarczak Decl. ¶ 16.) FonJax accepted these payments, but did not inform Co-Investor that it considered the payments late or that its Preferred Stock had been converted to Common Stock. Thereafter, Co-Investor fully paid on the final installment of the Third Tranche Notes, claiming that it was under the belief that it was continuing to acquire Preferred Stock. (Wloddarczak Decl. ¶ 16.)

In early November 2007, Co-Investor learned for the first time from FonJax that the company was taking the position that its Preferred Stock had been converted to Common Stock. (Id. ¶ 17.) In early December, FonJax forwarded an email from its counsel explaining that FonJax considered all of Co-Investor's Preferred Stock to have been converted effective June 1, 2007. (Id. ¶¶ 17-18 and Ex. D.)

### D. PROCEDURAL HISTORY

Co-Investor filed a Complaint against FonJax on April 4, 2008, in order to preserve its position as a Series A Preferred Shareholder in the company. The Complaint alleges six causes of action for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; (4) declaratory judgment; (5) promissory estoppel; and (6) unjust enrichment. (Docket 1.) FonJax subsequently filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). On September 22, 2008, the Court granted the motion as to Co-

Investor's claim for promissory estoppel only, but denied the motion in all other respects. (Docket 21).[3]

While the aforementioned motion to dismiss was pending, and unbeknownst to Co-Investor, FonJax sold substantially all of its assets to Keynote Systems, Inc. ("Keynote") for $2.5 million. (Wlodarczak Decl. ¶ 21.) Co-Investor was not consulted prior to the sale, as would otherwise have been its right as a preferred shareholder. (Restated Certificate, Art. IV. ¶ 5(a).) Based on the terms of the sale and corresponding stock valuation, Co-Investor asserts that it is entitled to $1,118,131.08 of the proceeds from the Keynote transaction, based on the value of FonJax Preferred Stock. (Id. ¶ 22.) However, Co-Investor asserts that if its Preferred Stock is deemed converted to Common Stock, the value of its interest is only $1,597.28. (Id.)

As a result of the sale to Keynote, Co-Investor filed an ex parte application for a temporary restraining order ("TRO") on October 9, 2008, in which it sought an injunction directing FonJax to withhold distribution of $1,118,131.08 (representing Co-Investor's alleged share) pending resolution of this action. (Docket 26.) Co-Investor claims that if FonJax is allowed to distribute all of the proceeds from the Keynote sale, FonJax will become an empty shell with no assets and no ability to satisfy any judgment in this action. (Wlodarczak Decl. ¶ 24.) The parties were able to reach agreement on a stipulated TRO, which was submitted on October 20, 2008. (Docket 33.) The issue now before the Court is whether the stipulated TRO should continued in the form of a preliminary injunction.

---

[3] As will be set forth below, the Court's analysis of Co-Investor's claims for breach of contract and breach of the implied covenant of good faith and fair dealing in the Order pertaining to the motion to dismiss differs from the conclusions reached in connection with this motion. Unlike a Rule 12(b)(6) motion where the allegations of the Complaint are accepted as true and are construed in a light most favorable to the plaintiff, a motion for preliminary injunction requires the rigorous consideration of evidence submitted by the parties. See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). Reviewing the evidence presented, in tandem with the various documents comprising the SPA, and given the different procedural posture of this case, the Court reevaluates a number of conclusions reached in the order on the motion to dismiss.

## II. LEGAL STANDARD

There are two tests applicable to a preliminary injunction. Under the traditional formulation, the Co-Investor must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to Co-Investor if preliminary relief is not granted, (3) a balance of hardships favoring the Co-Investor, and (4) advancement of the public interest (if applicable). See Natural Res. Def. Council, Inc. v. Winter, 518 F.3d 658, 677 (9th Cir. 2008). Under the alternative formulation, "a court may grant the injunction if the Co-Investor demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." Id. (citation omitted). The two formulations represent two points on a sliding scale with the focal point being the degree of irreparable injury shown. Oakland Tribune, Inc. v. Chronicle Publ'g Co., 762 F.2d 1374, 1376 (9th Cir. 1985). Preliminary injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek, 520 U.S. at 972 (citation and internal quotations omitted).

## III. DISCUSSION

### A. BREACH OF CONTRACT

#### 1. Conversion of Preferred Shares Under the SPA

The elements for breach of contract are: (1) the existence of a valid contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damage to the plaintiff. McKell v. Washington Mutual, Inc., 142 Cal. App. 4th 1457, 1489 (2006). Co-Investor contends that FonJax breached the SPA and related amendments by "not delivering the Series A Preferred Stock and by taking action to convert the Series A Preferred Stock in violation of the SPA." (Compl. ¶ 32.)

Co-Investor argues that it will prevail on this claim on the ground that FonJax had no right to convert the Preferred Shares because it fully complied with Section 7(a) of the SPA, as restated in the Certificate of Amendment. (Pl.'s Mot. at 7.) According to Co-Investor, Section 7(a) only requires that it provide "evidence" of payment for each installment due on the Third Tranche Notes, and that its email to FonJax on June 1, 2007 satisfies that obligation. (Id.) The Court

disagrees.  Section 7(a) explicitly states that Co-Investor was to provide "evidence … of having wired funds to the bank account designated by the Corporation for <u>the payment of principal and accrued interest due</u> on each of the Third Tranche Notes…."  (Cert. of Am. § 7(a) (emphasis added).)  Although Co-Investor's email notified FonJax that it had wired a payment, it is undisputed that such payment was for the principal only.  (Wlodarczak Decl. ¶ 15; Moore Decl. ¶ 15.)  The interest due that should have been included in that payment was not paid until over a month later.  (Wlodarczak Decl. ¶ 16; Moore Decl. ¶ 15.)  In addition, Co-Investor does not dispute its failure to provide any evidence for the payment due on June 30, which again did not include the payment of accrued interest.  Having failed to both make the requisite payments which were due and submit the requisite "evidence" of payment to FonJax, all of Co-Investor's Preferred Shares became subject to conversion "automatically."  (Cert. of Am. § 7(a) (emphasis added).)[4]

Co-Investor next argues the stock conversion was ineffective on the grounds that FonJax failed to deliver any Common Stock upon the conversion of the Preferred Stock, as ostensibly required by Section 7(b) of the Certificate of Amendment.  (Pl.'s Mot. at 7-8.)  This provision states that "<u>[t]he holder</u> of any shares of Series A Preferred Stock converted pursuant to this Section 7 <u>shall deliver to the Corporation</u> ... <u>the certificates for the shares so converted</u>….  As promptly as practicable thereafter, the Corporation shall deliver to such holder …. a certificate or certificates for the number of full shares of Commons Stock to be issued…."  (<u>Id.</u>)  The express language of this section clearly imposes the initial burden on the holder of the converted Preferred Stock, i.e., Co-Investor, to trigger Section 7(b)'s requirements.  Moreover, Section 7(a) provides that the conversion occurs "automatically," and is not dependent upon compliance with Section 7(b) or any other provision of the SPA.  Given the plain language of the SPA, the Court finds that

---

[4] FonJax also contends that conversion was justified on the ground that the payments were not received in its bank account by 5:00 p.m. on either May 31, 2007 or June 30, 2007.  (Def.'s Opp'n at 8.)  However, the SPA does not speak to when the funds must be "received" by FonJax; it addresses only the time the funds are to be "wired" to the designated account.  Had the parties considered the date of receipt critical, they could have included it as a requirement.  In the absence of doing so, the Court finds that FonJax's arguments regarding receipt inapposite.

Co-Investor has little chance of prevailing on its claim that FonJax's conversion of Co-Investor's Preferred Stock constitutes a breach of the SPA.[5]

### 2. Conversion of Shares Purchased from a Third Party

Alternatively, Co-Investor argues that it has demonstrated a likelihood of success on its claim that FonJax improperly converted 511,517 shares that it purchased from a third party, outside the ambit of the SPA. (Pl.'s Mot. at 8.) FonJax argues that Section 7(a), as amended and restated in the Certificate of Amendment, refers to the conversion of "all" shares held by Co-Investor. (Def.'s Opp'n at 9-10.) In response, Co-Investor argues that the mandatory conversion provision was not intended to include shares purchased outside the SPA. (Pl.'s Mot. at 8.) Co-Investor asserts that the Certificate of Amendment specifically applies to the "Multiple Tranche Purchaser," which therefore means that the only stock subject to conversion was the stock being purchased under the SPA by Co-Investor. (Id.)

Co-Investor's reading of the SPA is untenable. Section 7(a), as amended and restated, explicitly provides for the conversion of "<u>all</u> of the Multiple Tranche Purchaser's shares of Series A Preferred Stock…..<u>then held by Multiple Tranche Purchaser</u>…." (Id. Ex. C § 7(a) (emphasis added).) At the time Co-Investor defaulted on its first installment of the Third Tranche Notes, the 511,517 shares were "then held" by Co-Investor and thus subject to conversion. There is no language circumscribing the scope of "all" to exclude stock shares purchased by Co-Investor outside the SPA. Had the parties intended to incorporate such limitation, they could have stated so explicitly. See Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman, 65 Cal. App. 4th 1469, 1478 (1998) ("We do not have the power to create for the parties a contract which they did not make and cannot insert language which one party now wishes were there."). The Court concludes that Co-Investor has not demonstrated a likelihood of success with respect to its breach

---

[5] As an ancillary matter, Co-Investor asserts that FonJax failed to amend its Certificate of Incorporation to reflect the conversion of the Preferred Stock, which is required in Section 8 of the Amendment to the SPA. (Pl.'s Mot. at 7.) FonJax admits its failure to comply with this provision. However, there is nothing in the SPA stating that compliance with Section 8 is a prerequisite to implementation of the automatic conversion provision. Moreover, as FonJax correctly points out, Co-Investor fails to articulate any injury resulting from the failure to comply with Section 8. (Def.'s Opp'n at 8.)

of contract claim insofar as it pertains to the conversion of the 511,517 shares purchased outside the SPA.

### B. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 349 (2000). A party breaches the covenant where "it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." Carma Developers ( Cal.), Inc. v. Marathon Development California, Inc., 2 Cal. 4th 342, 372 (1992). There "can be no implied covenant where the subject is completely covered by the contract." Lippman v. Sears, Roebuck & Co., 44 Cal.2d 136, 142 (1955) (citation omitted). In addition, "implied terms should never be read to vary express terms." Carma Developers (Cal.), Inc., 2 Cal. 4th at 374.

Co-Investor first contends that it "timely paid the May Third Tranche Note" and that FonJax acted in "bad faith" by deeming the stock as being converted without notification of the conversion. (Pl.'s Pl.'s Mot. at 9.)[6] The Court disagrees. Under the terms of the SPA, the failure to provide evidence of payment of both the principal and accrued interest due by the specified time and date resulted in the conversion of Co-Investor's Preferred Stock. (Cert. of Am. § 7(a).) There is no provision in the SPA requiring FonJax to provide notice of the conversion, which occurred "automatically." (Id.) The implied covenant of good faith and fair dealing cannot be utilized to impose requirements that do not exist under the terms of the contract. See Pasadena Live v. City of Pasadena, 114 Cal. App. 4th 1089, 1094 (2004) ("'The implied covenant of good faith and fair dealing is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.'") (citation omitted). Nor can the Court find that the SPA impliedly required FonJax to provide notice to Co-Investor as a

---

[6] The Court notes that Co-Investor's second cause of action for breach of the implied covenant of good faith and fair dealing does not allege the failure to provide notification of the conversion as a basis for such claim. (Compl. ¶¶ 36-43.) As such, it is questionable whether Co-Investor's failure to notify claim is properly before this Court.

prerequisite to conversion because it would be inconsistent with the automatic conversion provision. See Carma Developers (Cal.), Inc., 2 Cal. 4th at 374.[7]

Even if notice of the stock conversion were required, Co-Investor fails to identify the harm that it suffered as a result. See Wolkowitz v. Redlands Ins. Co., 112 Cal. App. 4th 154, 162 (2003) (damage is "[a]n essential element of a cause of action for breach of the implied covenant[.]"). As FonJax correctly points out, and Co-Investor does not dispute, notice of the conversion would not have altered Co-Investor's obligations to complete payment of the Third Tranche Notes. Under the Amendment to the SPA, the purchase of the shares encompassed by the Third Tranche was to close by April 30, 2007. (Am. to SPA § 2.3 ("the Third Tranche Closing shall be held on or before April 30, 2007[.]"). What changed under the Amendment to the SPA was the timing of Co-Investor's payment for the Third Tranche. Instead of wiring all of the funds to complete the purchase of the Third Tranche by April 30, 2007, Co-Investor's payment obligation was spread over the course of several installments. Section 7(a) was correspondingly amended to specify that the failure to provide evidence that the principal and interest were wired in a timely manner <u>with respect to any of those installments</u> would result in the conversion of all of Co-Investor's preferred stock. (Cert. of Am. § 7(a).) There is nothing in the SPA or in any of the related amendments or agreements that excuses Co-Investor from completing payment for the Third Tranche in the event of a conversion.

Equally without merit is Co-Investor's contention that the "short delay of payment" was not a material breach of the SPA, and therefore, FonJax had no right to deem the stock converted. (Pl.'s Mot. at 9.) The record supports the opposite conclusion. It is undisputed that FonJax originally opposed Co-Investor's proposal to structure its investment as a multiple tranche transaction, since it ostensibly would be unfair to other shareholders. (Moore Decl. ¶ 7.) According to FonJax, when Co-Investor indicated this requirement was non-negotiable, FonJax relented, but only on the condition that Co-Investor agreed to the automatic conversion of its

---

[7] Co-Investor claims that FonJax should have provided notice under Section 8.5 of the SPA. That provision merely specifies the <u>manner</u> in which notice, when required, is to be given. It does not address the events for which notice is required.

Preferred Stock to Common Stock if any of the tranche payments were late, "even in the slightest." (Id.) FonJax's intent in adding this strict condition was to create an incentive to ensure that FonJax made its payments on time. (Id.) The materiality of requiring timely payments is further supported by the fact that the SPA documents specify the date and time by which the payment must be paid, along with a warning that the failure to comply with that condition "shall result in the implementation of the special mandatory conversion [provision]…." (Restated Cert. § 7(a); Am. to SPA § 2.3; Promissory Notes; Cert. of Am. § 7(a).) Indeed, each of the Third Tranche Notes contains an express acknowledgement by Co-Investor that it understood a late payment would trigger the automatic conversion provision. Given this history and the record presented, it is clear that the timeliness of Co-Investor's payments was a material term of the SPA.

Finally, Co-Investor claims that conversion was improper because Section 7 is triggered only in the event that it failed to pay for both the Second Tranche <u>and</u> the Third Tranche. (Pl.'s Mot. at 10.) While that may have been correct under the original SPA, Co-Investor ignores that it agreed to amend this provision when it entered into the Amendment to the SPA, which replaced the conjunctive "and" with the disjunctive "or." Specifically, the operative version of Section 2.3 now states:

> 2. Section 2.3 of the [SPA] is hereby amended and restated in its entirety to read as follows:
>
> 2.3 **Second and Third Tranche Investments**….
>
> ¶ …the failure of the Multiple Tranche Purchaser to: (i) purchase the Second Tranche Shares on or before February 28, 2007, (ii) purchase the Third Tranche Shares on or before April 30, 2007 **or** (iii) <u>pay principal and accrued interest due on each of the Third Tranche Notes on their respective maturity dates</u> (as defined in the Third Tranche Notes) shall result in implementation of the special mandatory conversion set forth in Article IV, Section 7 of the Restated Certificate.

(Am. to SPA § 2.3 (emphasis added). Tellingly, Co-Investor fails to address this point in its Reply.

At bottom, the Court concludes that Co-Investor has failed to demonstrate a likelihood of success on its cause of action for breach of the implied covenant of good faith and fair dealing. There is no evidence that FonJax lacked a subjective belief in the validity of its position or that it acted in an objectively unreasonable manner. The parties' obligations under the SPA are clear and

unambiguous.  Co-Investor, an experienced and sophisticated venture capital firm, was well aware of the amounts to be paid and when those payments were due.  Co-Investor also was well aware of the consequences for failing to provide evidence that it paid the principal and accrued interest due on <u>any</u> of the Third Tranche Notes.  Despite such awareness, Co-Investor "initiated" its wire payments on the first and second installments of the Third Tranche Notes without including payment of interest.  (<u>See</u> Wlodarczak Decl. ¶ 16; Moore Decl. ¶ 15.)  As such, Co-Investor must now live with the consequences of having failed to keep its end of the bargain.

## IV. CONCLUSION

The Court concludes that Co-Investor failed to establish a likelihood of success on its claims for breach of contract or breach of the implied covenant of good faith and fair dealing.  Accordingly,

IT IS HEREBY ORDERED THAT:

1. Co-Investor's motion for preliminary injunction (Docket 26) is DENIED.  The stipulated Temporary Restraining Order (Docket 33) previously entered by the Court is dissolved.

2. The parties shall appear for a Case Management Conference on **November 4, 2009 at 2:45 p.m.**  The parties shall **meet and confer** prior to the conference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten (10) days prior to the Case Management Conference that complies with the Standing Order for All Judges of the Northern District of California and the Standing Order of this Court.  Plaintiff shall be responsible for filing the statement as well as for arranging the conference call.  All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

IT IS SO ORDERED.

Dated:  July 31, 2009

                                                        Hon. Saundra Brown Armstrong
                                                        United States District Judge